851 So.2d 943 (2003)
Byron K. LANDRY
v.
Luke BELLANGER, Jr.
No. 2002-C-1443.
Supreme Court of Louisiana.
May 20, 2003.
Rehearing Denied September 5, 2003.
*946 VICTORY, Justice.
We granted certiorari in this matter to consider whether or not the aggressor doctrine is a valid defense to an intentional tort under Louisiana's pure comparative fault regime. In addition, we are called to consider whether Section C of Civil Code Article 2323 prohibits a reduction of the plaintiff's recovery of damages for an injury partly the result of the fault of an intentional tortfeasor and partly the result of his own fault, when the plaintiff's fault amounts to more than mere negligence. For the following reasons, we conclude that the aggressor doctrine is inconsistent with Louisiana's comparative fault regime and no longer serves as a complete bar to plaintiff's recovery. However, self-defense is a valid defense to a battery, and in this case relieves the defendant of liability. We further find the prohibition of Section C is not applicable in situations where the plaintiff's conduct amounts to more than mere negligence.

FACTS AND PROCEDURAL HISTORY
On June 27, 1996, the plaintiff, Byron Landry ("Landry"), who had been living and working out of state, and his father, Ernest Landry, stopped at a local bar, Steve's Chevron, for a drink. While at the bar, Landry saw the defendant, Luke Bellanger, Jr. ("Bellanger"), a former high school classmate of his whom he had known for 20 years. Landry and Bellanger were both at the bar for several hours, drinking and visiting, except for a period of time when Bellanger left and returned later.
Landry's father left Steve's Chevron around 9:30 p.m., but Landry stayed behind drinking and visiting. As the evening progressed, Landry drank steadily over the next several hours, consuming approximately *947 eight beers. Bellanger returned to the bar with his friend, Lonnie Bell, and Landry was still there. Bell, who testified by deposition, stated that he witnessed the interaction between Landry and Bellanger and that Landry appeared to be intoxicated. He testified that Landry began talking in a loud voice and became very belligerent toward Bellanger. Landry continued to harass and insult Bellanger, suggesting that he was born with a "a silver spoon in his mouth," and that he never had to work hard a day in his life. Bellanger continually asked Landry to calm down and leave him alone but Landry continued, becoming louder and more aggressive. Bell corroborated Bellanger's account of the events leading up to this point, testifying as follows: "Mr. Bellanger repeatedly ... had asked ... to please leave him alone. Asked him repeatedly... to please calm down because he was getting a little hostile. Toward the end before they had their encounter, Mr. Landry was in Mr. Bellanger's face practically." Bell further added that at no time did Bellanger threaten Landry or say anything threatening to him.
When asked if Landry had issued a challenge to him or made any threatening comments to him, Bellanger testified that Landry walked up to him, poked him in the chest and said "if I wasn't such a f____ p____, he would take me outside [and] whip my ____." At that time, Bellanger asked Landry to step outside so they could talk, hoping he could get Landry to calm down. Landry and Bellanger then left the bar through the front door and stepped outside. Bellanger described what happened after they exited the bar, as follows:
I got up, walked towards the bar and I walked out first. He came out behind me. I walked about 10 feet from the door, I turned around and tried to tell him, Byron, we don't need to do this, you know, this is stupid. We're friends, there's no need for us to fight. He walked up to me and started pushing me with his chest and telling me, yes, I'm going to whip your____. I kept stepping back, I said, Byron, we don't need to do this. Well, he pushed me; when he pushed me, he kept coming. The only thing I could do was I had to defend myself.
According to Bellanger, he then struck Landry in the head with a partially closed fist, and Landry fell backwards and hit his head on the cement.
Landry's version of events is slightly different. Landry recalls that he and Bellanger argued about a woman and then Bellanger asked him to step outside. According to Landry, he walked out of the door first, but he remembers nothing about what happened in the parking lot other than being struck and falling down. The next thing Landry remembers is waking up at his parents' house the following day.
Lonnie Bell testified that he witnessed the entire incident, watching through the glass door from inside the bar. Bell indicated that prior to Landry and Bellanger going outside, it had "started to get pretty heated between the two" and Bellanger asked Landry to "step outside because he was starting to cause a scene inside of the bar." Bell reiterated that at no time did Bellanger threaten Landry. After exiting the bar, Bell saw Landry push Bellanger with his chest. Then Bell saw Bellanger hit Landry once in the head, causing him to fall to the ground and strike his head on the concrete parking lot. Bell stated that because Landry was "knocked out," they were reluctant to leave him on the ground. Thus, he and Bellanger lifted Landry into the bed of Bellanger's truck. Both Bell and Bellanger testified that although Landry was unconscious, he was still breathing *948 and appeared to be all right. Although Landry's injury turned out to be a severe head injury, there was no evidence presented that Bellanger should have been aware that Landry had been seriously injured as a result of falling to the concrete.
Between 10 and 45 minutes after they had put Landry in the bed of the truck, Landry's father returned to the bar to check on his son. Landry's father found him passed out in the back of Bellanger's truck and assumed he had too much to drink. With the assistance of Bellanger and Bell, Landry's father put him into his vehicle and drove him home. Landry's father was unable to remove him from the vehicle so he left him there until the next morning, at which time he was able to walk with assistance. After several days of vomiting and headaches, Landry went to the emergency room at Lady of the Sea Hospital in Galliano for treatment. Tests revealed a skull fracture and a hematoma on the brain. Landry was immediately sent to Thibodaux Regional Medical Center where he underwent brain surgery for removal of the hematoma. Following surgery, he remained in the hospital for eight days and then later returned to his home in Florida with his wife.
Even after his recovery, Landry was unable to return to his former employment as an engineer in the marine industry. Landry testified that his treating neurologist advised him that he could never return to his previous employment. As a result of his brain injury, he was left with permanent neurological deficits, including loss of taste and smell, memory loss, and multiple personality changes. He also suffers from a seizure disorder and still has seizures on a daily basis. Landry sued Bellanger, claiming Bellanger committed an intentional tort, a battery, against him which caused his damages.
The trial court rendered a judgment in favor of Landry and awarded $400,000 in general damages, $320,000 in past and future loss of wages, and $24,278.41 in medical expenses, together with legal interest from the date of judicial demand and court costs. The trial court found that it was more probable than not that Landry's injury occurred when he fell onto the concrete surface in the parking lot after being struck by Bellanger and thus, his injuries were caused by a battery committed by Bellanger. In the trial court's reasons for judgment, the court found that Bellanger invited Landry outside so that he could "gain some measure of satisfaction for the verbal abuse he had endured inside of the bar for most of the evening." Accordingly, the trial court concluded that when Bellanger invited Landry outside, Bellanger became the aggressor. The trial court determined that Bellanger used force that was totally unnecessary under the circumstances and was not acting in self-defense. Additionally, the trial court noted that Landry's actions leading up to the confrontation were significant in determining the cause of his injuries and damages. The trial court recognized that prior to the amendment of Civil Code Article 2323, a plaintiff's negligence could be used to mitigate and reduce the damages resulting from an intentional tort committed by a defendant. However, it found that the amendment to Article 2323, in Paragraph C, provides that the claim for damages by a person injured partly by his own negligence and partly by an intentional tortfeasor shall not be reduced. Thus, the trial court concluded that Landry's actions can have no effect on the liability of Bellanger and the damages recovered by Landry as a result of Bellanger's liability.
On appeal, the First Circuit concluded the trial court erred in refusing to apportion fault in accordance with Article 2323. Landry v. Bellanger, 00-2029 (La.App. 1 *949 Cir. 3/28/02), 813 So.2d 598. The court of appeal held that Article 2323(C) applies only in cases where a plaintiff's contributory fault consists of negligence and does not apply where a plaintiff's fault is intentional in nature. The court of appeal noted that the trial court acknowledged Landry's actions leading up to the confrontation were significant in determining the cause of his injuries and damages. Rejecting the trial court's conclusion that Landry's actions were negligent, the court of appeal found that these "significant" acts were intentional, not negligent, and therefore warrant a comparative fault analysis. After reviewing the evidence, the court concluded that fault should be apportioned equally between Landry and Bellanger.
Thereafter, Bellanger applied for supervisory writs in this Court, arguing that the lower courts erred in failing to properly apply the aggressor doctrine to deny a claim for damages sustained by an identified aggressor as a result of his own aggression.
We granted certiorari to consider the correctness of the court of appeal's judgment. Landry v. Bellanger, 02-1443 (La.10/14/02), 827 So.2d 409.

DISCUSSION
Under Louisiana Civil Code Article 2315, a person may recover damages for injuries caused by a wrongful act of another. According to that Article, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. C.C. art. 2315(A). Historically, fault has been the basis for tort liability in Louisiana. Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, 717. Furthermore, Louisiana embraces a broad civilian concept of "fault" that encompasses any conduct falling below a proper standard, including intentional torts. Id. at 718. A battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact ..." Caudle v. Betts, 512 So.2d 389, 391 (La.1987). The defendant's intention need not be malicious nor need it be an intention to inflict actual damage. Id. It is sufficient if the defendant intends to inflict either a harmful or offensive contact without the other's consent. Id.
Under long-standing Louisiana jurisprudence, a plaintiff's recovery for damages resulting from an assault or battery would be precluded if the plaintiff's own actions were sufficient to provoke the physical retaliation. According to this "aggressor doctrine," plaintiff's recovery is precluded if the evidence establishes "he was at fault in provoking the difficulty [sic] in which he was injured, unless the person retaliating has used excessive force to repel the aggression." See Baugh v. Redmond, 565 So.2d 953, 959 (La.App. 2 Cir. 1990); Slayton v. McDonald, 29,257 (La. App. 2 Cir. 2/26/97), 690 So.2d 1914 (Louisiana's aggressor doctrine precludes tort recovery where the plaintiff acts in such a way to provoke a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff, unless the person retaliating has used excessive force to repel the aggressor); Clark v. Burchard, 00-2750 (La.App. 4 Cir. 11/14/01), 802 So.2d 824; Frazer v. St. Tammany Parish School Bd., 99-2017 (La.App. 1 Cir. 12/22/00), 774 So.2d 1227; Duck v. McClure, 36,045 (La.App. 2 Cir. 5/8/02), 819 So.2d 1070; Frame v. Comeaux 98-1498 (La.App. 3 Cir. 4/21/99), 735 So.2d 753; Susananbadi v. Johnson, 97-91 (La.App. 5 Cir. 10/17/97), 700 So.2d 886; Minkler v. Chumley, 32,558 (La.App. 2 Cir. 12/8/99), 747 So.2d 720.
The aggressor doctrine is unique to Louisiana, having evolved through decades of *950 jurisprudence, but lacking any statutory or common law basis. However, the origin of the doctrine is possibly rooted in the legal maxim "volenti non fit injuria," which provides "to one who is willing, no wrong is done." W. Page Keeton et al., Prosser & Keeton on The Law of Torts. § 18, at 112 (5th ed.1984). The earliest Louisiana decision addressing the aggressor doctrine seems to be Vernon v. Bankston, 28 La. Ann. 710 (1876). Therein, the rule was stated as follows:
[O]ne who is himself in fault cannot recover damages for a wrong resulting from such fault, although the party inflicting the injury was not justifiable under the laws.
28 La.Ann. 710, 711 (1876). The Vernon case asserts that this rule is well-settled in the jurisprudence of this State. However, the Court failed to cite any cases to support that the doctrine was indeed "well-settled." In fact, there does not appear to be any prior Louisiana jurisprudence asserting the aggressor doctrine principle.[1] Furthermore, in addition to the puzzling origin of the aggressor doctrine, Louisiana courts have applied the principle inconsistently, producing a rather confusing body of case law.[2]
Later, in Bonneval v. American Coffee Co., 127 La. 57, 53 So. 426 (1910), the Court held that "[i]n an action for damages for an assault and battery committed without legal excuse, the plaintiff is entitled to recover, unless he provoked the difficulty by insults, abuse, threats, or other conduct, well calculated to arouse the resentment or fears of the defendant." Accord, Hingle v. Myers, 135 La. 383, 65 So. 549 (1914) and Johns v. Brinker, 30 La. Ann. 241 (La.1878) (each applying the aggressor doctrine to preclude recovery where the plaintiff verbally provoked the defendant).
On the other hand, in other cases this Court did not bar the plaintiff's recovery, but concluded that aggression could be a ground to mitigate damages. For example, in Munday v. Landry, 51 La.Ann. 303, 25 So. 66 (1899), we concluded:
Words written or spoken some time prior will not justify a physical attack upon the one by whom they were written or spoken. The law had never gone further than to permit mere provocation to be shown as a palliation for the acts and result of anger. The legal phrase is `in mitigation,' not `in justification.' The jury must have found ground to mitigate damages, but not enough to justify the act,a conclusion affirmed by the court.
Accord Richardson v. Zuntz, 26 La. Ann. 313 (La.1874) (holding that even when it is shown there was a great provocation, in civil actions such provocation may mitigate damages, but never justifies the unlawful act).
While there was a line of cases following Richardson, "the great bulk of the modern *951 Louisiana jurisprudence had been entirely consistent with the disposition ...say something calculated to outrage the defendant, and his physical retaliation, while unjustified, goes unredressed." Robertson, The Aggressor Doctrine, 1 S.U. L.Rev. at 93.
Then, in Harvey v. Harvey, 124 La. 595, 50 So. 592 (1909), a plaintiff sued for damages from a "malicious" slap in the face by the defendant and the Court found that the provocation in this case (insult and abuse of the defendant) did not justify the assault and battery in question but merely constituted a mitigating circumstance in favor of the defendant. Similarly, in Moore v. Blanchard, 216 La. 253, 43 So.2d 599 (1949), this court quoted the following principles from the assault and battery section of American Jurisprudence:
The courts are not fully in accord as to the right of the defendant to introduce in evidence facts of provocation or malice for the purpose of mitigating the actual or compensatory damages. The better rule and the weight of authority, however, are in favor of the proposition that actual or compensatory damages are not subject to mitigation by proof of mere provocation or malice. To hold otherwise would be to allow provocation to be used as a defense, and thus to permit by indirection that which could not be done directly ... The reason for the rule allowing provocation to be introduced in evidence for the purpose of mitigating actual or compensatory damages is that as the plaintiff provoked the assault, he is himself guilty of the act which led to the disturbance of the public peace.
Moore, 43 So.2d at 601 (citing 4 American Jurisprudence, § 165).
As the aggressor doctrine progressed through our jurisprudence, the doctrine was modified by exceptions. In Oakes v. H. Weil Baking Co., 174 La. 770, 141 So. 456 (1932), the Court affirmed a judgment in favor of plaintiff where the trial court found the defendant's use of force excessive. The Court found that even if the plaintiff was at fault and the defendant had ample provocation for physically ejecting him from the premises, the "parting kick" inflicted after the plaintiff had been put out of the building was not necessary and wholly unjustified. The Court concluded, "Under no theory can it be said that defendant was warranted in using any greater force than was necessary in ejecting plaintiff from the premises." Oakes, 141 So. at 457.
Later in 1969, the rule concerning excessive force was then set forth as the following:
It is equally well settled that even where there is an aggressive act, justifying a battery, the person retaliating may use only as much force as is necessary to repel the aggression; and that if he goes beyond this, he using force in excess of what would have been reasonably necessary, he is liable for damages for injury caused by the employment of such unnecessary force.
Tripoli v. Gurry, 253 La. 473, 218 So.2d 563, 564 (1969).
Finally, the Court again modified the doctrine finding that mere words of provocation would not bar a plaintiff's recovery. In Morneau v. American Oil Co., 272 So.2d 313 (La.1973), the Court concluded,
We granted this writ primarily because, contrary to earlier Supreme Court decisions, a number of Court of Appeal decisions have followed a rule of law that words constitute provocation which excuses a battery ... [T]he courts below erred in considering mere words as justification for a battery. The rule of law earlier adopted and followed by our court has even more merit today. The *952 deviations in the holdings of the Courts of Appeal not only are contrary to those pronouncements but are contrary to the majority rule in this country. Moreover, they run contrary to our system of justice under law which commands the use of judicial process rather than force for the settling of disputes ... Applying the rule of law that words which are calculated to provoke and arouse to the point of physical retaliation may mitigate the damages in a civil action, we find the words used here, in the context of this incident, are insufficient to merit any mitigation of damages.
Louisiana's intentional tort doctrine has traditionally afforded an intentional tortfeasor a full defense if he can establish consent, privilege or self-defense, or enough provocation to trigger the aggressor doctrine; and a partial defense if the defendant can show a "merely verbal" provocation for a mitigation of damages. David Robertson, The Louisiana Law of Comparative Fault: A Decade of Progress, 1 Louisiana Practice Series 5 (Louisiana Judicial College, 1991).
Hence, the existence of consent means the defendant did not commit a tort and the existence of a privilege means the defendant's tort was justified. Robertson, Louisiana's Law of Comparative Fault: A Decade of Progress, at 6-7. Conversely, Louisiana's aggressor and mitigation doctrines are victim-fault defenses. Id. Neither theory implies that no tort has occurred or that the defendant's conduct was justified, but instead seek to penalize the victim. Id. As Robertson then points out, "On this analysis the percentage-fault approach should replace both the aggressor doctrine and the mitigation doctrine, while leaving the full defenses of consent and privilege intact. In this way the comparative fault principles will be confined to the job they were designed to dotaking victim fault into account." Robertson, The Louisiana Law of Comparative Fault: A Decade of Progress, supra, at 7.
In this case, we are presented with the issue of whether the aggressor doctrine is still a valid defense that would bar the plaintiff's recovery following the 1996 amendments to Article 2323. Article 2323 provides that "[i]n any action for damages..., the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty ... The [foregoing] provisions ... shall apply to any claim for recovery of damages ... asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability." La. C.C. art. 2323(A) and (B). Thus, this article clearly requires that the fault of every person responsible for a plaintiff's injuries be compared regardless of the legal theory of liability asserted against each person.[3]Dumas v. State, 02-0563 (La.10/15/02), 828 So.2d 530.
The above provisions indicate that Louisiana employs a "pure" comparative fault system, whereby the fault of all persons causing or contributing to injury is to be compared. When it adopted the comparative fault system, Louisiana abolished the contributory negligence feature, which completely barred the recovery of injury victims because of their fault, our tort law *953 formerly embraced prior to 1980. See Dumas, supra, 02-0563 at pp. 4-5, 828 So.2d at 532-33. Applying the aggressor doctrine to bar plaintiff's recovery would reintroduce some vestige of contributory negligence law to our tort system and ignore the plain language of Article 2323(A) that directs the court to allocate a proportion of fault to every party contributing to the injury. This court dealt with a similar proposition in Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La. 1988). In that case, this Court held that the survival of assumption of risk as a total bar to plaintiff's recovery would be inconsistent with the mandate of a former version of Article 2323 stating that contributory negligence should no longer operate as a complete bar to plaintiff's recovery. Characterizing assumption of risk as a form of contributory negligence, we noted that it would be anomolous to hold that the same conduct which results only in a reduction in recovery when it is described as "comparative negligence" somehow should operate as a total bar to recovery when described as "assumption of risk." Id., 521 So.2d at 1133. In Murray, this Court concluded that the fact that the plaintiff may have been aware of the risk created by the defendant's conduct should not operate as a total bar to recovery. Instead, comparative fault principles should apply, and the victim's "awareness of the danger" is among the factors to be considered in assessing the percentages of fault. Id. at 1134.
As we explained in Murray, the premise underlying the assumption of the risk defense was that a plaintiff who disregards a known risk has consented to his own injury and agreed to relieve the potential defendant of liability for that injury. Id. at 1135. Similarly, under the aggressor doctrine, the plaintiff is deemed to have consented to the physical retaliation by provoking the defendant, thereby relieving the defendant of liability for any damages that may result. Just as we did in Murray with respect to assumption of the risk, we find the aggressor doctrine no longer has a place in Louisiana tort law. Pursuant to the rules imposed by Article 2323, comparative fault principles should be applied to alleged plaintiff negligence, thereby eliminating the inequities inherent in the "all or nothing" recovery rules that prevailed prior to the adoption of comparative fault. We find the purpose of the aggressor doctrine, which condemns actions by barring recovery, is adequately served by the civilian concepts of comparative fault, duty/risk, and privileges.
The trial court in this case, however, relying on the provisions of La. C.C. art. 2323(C), was of the opinion that the imposition of comparative fault was inapplicable. Section (C) of art. 2323 provides:
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
Nothing in this section prevents the determination of the percentage of fault of all persons causing or contributing to the injury at issue. Rather, Section C provides that when plaintiff is injured as a result of the fault of an intentional tortfeasor, his negligence shall not reduce his recovery. Thus, reading each section of La. C.C. art. 2323 and giving effect to each portion of the Article, we find that the fault of all persons causing or contributing to injury, regardless of the basis of liability, is to be determined, and, if a negligent plaintiff is injured as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced by his percentage of fault.
*954 It is appropriate to consider each party's respective fault when a matter involves intentional tortfeasors. In prohibiting the reduction of a negligent plaintiff's damages, Article 2323(C) reflects a legislative determination that on the continuum of moral culpability, the act of an intentional actor should not benefit from a reduction in the damages inflicted on a less culpable negligent actor. In the face of the silence of La. C.C. art. 2323(C) regarding how to address the comparative fault of two intentional actors, we can extrapolate from paragraphs A and B of La. C.C. art. 2323 that the fault of the intentional actors can be compared. In the instant case, the plaintiff's conduct was not merely negligent, but intentional, and therefore the provisions of Section C are inapplicable.
Furthermore, the trial court found that because the plaintiff suffered an injury partly as a result of the fault of an intentional tortfeasor, Section C prevented a reduction of plaintiff's damages by the percentage of plaintiff's fault attributable to his injury. By its own terms, Section C applies only when plaintiff is injured partly by his own negligence and partly by an intentional tortfeasor. The application of Section C furthers public policy by preventing an intentional tortfeasor from using the comparative fault regime to reduce his own obligation to compensate a less culpable victim. Even before the 1996 addition of Section C, in Veazey v. Elmwood Plantation Assoc., 93-2818 (La.11/30/94), 650 So.2d 712, 719, we recognized this public policy and held that a negligent tortfeasor, "who by definition acted unreasonably under the circumstances in breaching their duty to plaintiff, should not be allowed to benefit at the innocent plaintiff's expense by an allocation of fault to the intentional tortfeasor under comparative fault principles." Therefore, the court of appeal correctly concluded that Section C applies only when plaintiff's contributory fault consists of negligence and does not apply where the plaintiff's fault is intentional.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine which party should prevail by a preponderance of the evidence. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 747; McLean v. Hunter, 495 So.2d 1298, 1304 (La. 1986). The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). In the present case, a legal error occurred when the trial court incorrectly applied Section C of Article 2323, thereby concluding that the plaintiff's intentional conduct could not effect the defendant's liability and should not be included in the allocation of fault to all parties contributing to plaintiff's injuries. Thus, this Court must make an independent de novo review of the record, in order to render a judgment on the merits.
In a suit for damages resulting from an intentional tort, the claimant must carry the burden of proving all prima facie elements of the tort, including lack of consent to the invasive conduct. In turn, the defendant may seek to prove that he is without fault because his actions were privileged or justified, such as self-defense. Self-defense, unlike the aggressor doctrine, is a true defense in that it operates *955 as a privilege to committing the intentional tort. In such a case, a plaintiff's conduct must have gone beyond mere provocation under the aggressor doctrine. Under Louisiana jurisprudence, in order to succeed on a claim of self-defense (not involving deadly force), there must be an actual or reasonably apparent threat to the claimant's safety and the force employed cannot be excessive in degree or kind. Robertson, The Aggressor Doctrine, 1 S.U. L.Rev. at 90. The privilege of self-defense is based on the prevention of harm to the actor, not on the desire for retaliation or revenge, no matter how understandable that desire. Id. at 84. Furthermore, the prevailing view in almost every one of our sister states is:
Threats and insults may give color to an act of aggression, but in themselves, they do not ordinarily justify an apprehension of immediate harm, and the defendant is not privileged to vindicate his outraged personal feelings at the expense of the physical safety of another. Such provocation is considered only in mitigation of the damages.
Prosser and Keeton on The Law of Torts, § 19, at 126.
Absent a qualifying privilege, any provocative or aggressive conduct on the part of the plaintiff should be incorporated into the allocation of fault by the trier of fact. However, simply because the trier of fact must consider the fault of both plaintiff and defendant, does not mean that an aggressive plaintiff can avoid responsibility for his conduct. In fact, nothing prevents a trier of fact from determining that the plaintiff's conduct was of such a provocative nature as to render it the sole cause of his injury. Thus, we must consider Landry's conduct to determine whether Bellanger was acting in self-defense, such that his conduct was justified or privileged and precludes recovery by Landry, or whether self-defense is unavailable as a complete defense, such that Landry and Bellanger's relative fault must be compared. We find, after a de novo review of the record, that Bellanger was acting in self-defense and is therefore without fault in causing Landry's injuries.
In the instant case, the lower court concluded that Bellanger committed a battery on the person of Landry. Clearly, by punching Landry, Bellanger perpetrated the harmful contact needed for an intentional tort and thus we find no manifest error in the trial court's conclusion that Bellanger committed a battery when he punched Landry. However, the trial court also found that in striking Landry, Bellanger was not acting in self-defense. We disagree.
As indicated above, it is undisputed that Landry provoked this situation based on the harassment and insults he directed toward Bellanger. According to Bellanger, Landry physically poked him in the chest inside the bar while threatening that "if [Bellanger] wasn't such a f____ p____, he would take [him] outside [and] whip [his] ____." Although Bellanger asked Landry to step outside the bar, Landry willingly did so, and Bellanger testified that he had no intention of fighting, he just wanted to get Landry out of the bar because he was causing such a commotion. After exiting the bar, the testimony is uncontroverted that Landry continued the physical confrontation he had started by aggressively bumping Bellanger with his chest while threatening to whip his ____. Although Landry claims he was struck first, he admitted to being intoxicated and to having a very vague memory regarding the events of the evening. Further, Bell verified that Landry started the physical confrontation outside. In evaluating the record de novo, we find that Landry's completely unnecessary and unrelenting verbal *956 provocation became a physical confrontation when Landry first poked Bellanger inside the bar while threatening physical violence, and then physically and aggressively pushed Bellanger with his chest outside the bar while continuing to threaten physical violence.
Bellanger responded with only one punch. His response was legally permissible self-defense, was justified under the circumstances, and did not involve excessive force, especially considering that Landry outweighed Bellanger by 90 pounds and considering that Landry was highly intoxicated, making his actions unpredictable. Because Landry followed his verbal provocations with physical confrontations, Bellanger was justified in striking a blow to defend himself. Under all these circumstances, we find that Bellanger acted in self-defense and was not at fault in causing Landry's damages.

CONCLUSION
The aggressor doctrine has traditionally precluded tort recovery where a plaintiff's own actions, though not necessary physical, were sufficient to provoke a physical retaliation. However, we find that the aggressor doctrine is inconsistent with Louisiana's pure comparative fault regime. Thus, pursuant to the rules imposed by Article 2323, comparative fault principles should be applied to such a plaintiff's actions, thereby eliminating the inequities inherent in the "all or nothing" recovery rules that prevailed prior to the adoption of comparative fault. A comparison of fault is required in spite of Section C of Article 2323, which only prohibits a reduction of the plaintiff's recovery of damages for an injury partly the result of the fault of an intentional tortfeasor and partly the result of his own negligence. Here, the plaintiff's fault amounted to an intentional tort, not mere negligence, and as such the prohibition contained in Article 2323(C) does not apply. However, self-defense is still a valid defense to a battery, and because Bellanger acted in self-defense in this case, he is not liable for Landry's injuries.

DECREE
For the reasons stated herein, the judgment of the trial court is reversed and judgment is entered for the defendant.
REVERSED AND RENDERED.
KIMBALL, J., dissents and assigns reasons.
KNOLL, J., dissents for reasons assigned by KIMBALL, J.
KIMBALL, J., Dissenting.
I agree with the majority's finding that the aggressor doctrine is inconsistent with Louisiana's comparative fault regime and no longer serves as a complete bar to plaintiff's recovery. In addition, I agree with the majority that the prohibition of Civil Code Article 2323, Section C is not applicable in situations where the plaintiff's conduct amounts to more than mere negligence. I dissent, however, because I believe the majority erred in finding that self-defense applies under the facts of this case. The majority decision, which relieves the defendant of all liability in this situation, ignores the reasonable factual findings of the trial court and produces the exact effect of applying the aggressor doctrine, whereby the plaintiff's fault in provoking an intentional tort would bar his recovery.
As an initial matter, the majority concludes that due to the legal error committed by the trial court, this court must make an independent de novo review of the record. Consequently, the majority disregards all of the trial court's findings of fact including those critical in this case *957 that were based on the trial court's credibility determinations. The majority finds that a legal error occurred when the trial court incorrectly applied Section C of Article 2323, thereby concluding that the plaintiff's intentional conduct could not affect the defendant's liability and should not be included in the allocation of fault to all parties contributing to plaintiff's injuries. However, in my view, this legal error does not merit a complete disregard of every fact finding made by the trial court and especially those findings based on credibility determinations.
In conducting a de novo review of the record, the majority found that Landry's "completely unnecessary and unrelenting verbal provocation became a physical confrontation when Landry first poked Bellanger inside the bar while threatening physical violence, and then physically and aggressively pushed Bellanger with his chest outside the bar while continuing to threaten physical violence." Accordingly, the majority adopts Bellanger's version of events that is largely uncorroborated by evidence in the record and was obviously judged to be unworthy of belief by the trial court. The only non-party eyewitness, to provide testimony of the events in question, Lonnie Bell, stated that he did not at any time hear Landry make any threatening statements to Bellanger. Even though Bell saw Landry push Bellanger with his chest after Bellanger and Landry walked outside, Bell was inside the bar when the physical altercation took place and only witnessed the events that occurred through a glass door. Bell was not in a position to hear Landry threaten Bellanger after the two had exited the bar. The only person to provide testimony that Landry had threatened Bellanger, was Bellanger. In making the above mentioned findings of fact, the majority improperly reassesses the credibility of the witnesses. It is my view, therefore, that the record supports the trial court's factual findings based on reasonable evaluations of credibility and therefore, these findings should not be disturbed by this court.
As pointed out by the majority, the privilege of self-defense is based on the prevention of harm to the actor and requires there to be an actual or reasonably apparent threat to the defendant's safety. David Robertson, The Aggressor Doctrine, 1 S.U. L.Rev. 82, 90 (1975). "Threats and insults may give color to an act of aggression, but in themselves, they do not ordinarily justify an apprehension of immediate harm, and the defendant is not privileged to vindicate his outraged feelings at the expense of the personal safety of another." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 19, at 126 (5th ed.1984). In the present matter, the record contains no evidence, other than Bellanger's self-interested testimony that the trial court rejected as incredible, that Landry posed a reasonably apparent threat to Bellanger's safety. Bellanger and Landry had known each other over 20 years and had never had any prior confrontations. While Landry substantially outweighed Bellanger, the evidence indicates that Landry was extremely intoxicated. In fact, Landry was so intoxicated that Bellanger, who was 90 pounds smaller, was able to knock the much larger Landry to the ground with a single open-fisted punch. With Landry in such a state of intoxication, he would unlikely have posed a reasonable threat to Bellanger, a fact recognized by the trial court. Although Bellanger testified that Landry had threatened to "whip his ass," the record, which contains eyewitness testimony, has no evidence to corroborate this threat.
Moreover, Bellanger's actions were not in self-defense because his use of force was excessive. The amount of force used in self-defense must be reasonable, i.e. not *958 disproportionate to the harm from which the actor seeks to protect himself. Restatement (Second) of Torts § 63 cmt. j (1965). The term "excessive force,"
... can be readily understood when it is employed in connection with common defenses such as self-defense, defense of another, or defense of property. In such cases the assaulting defendant is privileged to use force as a means of attaining some socially desirable end the protection of person or property. The force must be limited to such as appears reasonably necessary to achieve the purpose for which the defense was given, and anything more is excessive and beyond the protection of the privilege.
Wex S. Malone, Private Law, Work of the Louisiana Appellate Courts for the 1964-65 Term, 26 La. L.Rev. 517, 518 (1966).[1] Thus, it appears to me that Bellanger's use of force exceeded the amount of force necessary to prevent Landry from chest bumping him.
In addition to substituting its judgment on credibility of the witnesses for that of the trial court, the majority's opinion in my view creates bad policy. Even under principles of the aggressor doctrine, which the majority correctly concludes is inapplicable, the rule of law adopted long ago by this court provided that mere words spoken, however much they may be calculated to excite and irritate, do not justify a battery. Richardson v. Zuntz, 26 La.Ann. 313, 315 (1874). We previously held that to conclude otherwise would run contrary to our system of justice under law which commands the use of judicial process rather than force for the settling of disputes. Morneau v. American Oil Co., 272 So.2d 313, 316 (La.1973). Yet, in the present case, the majority concludes that other than verbal provocation, the mere act of someone bumping you with their chest is enough to justify a punch in the face. By finding that Bellanger's response was legally permissible self-defense, the majority has essentially given their approval to the continuance of the archaic principles behind the aggressor doctrine.
Notwithstanding the ability to decide the case de novo, in a case where the credibility of the defendant and his friend was critical due to the incapacity of the plaintiff, and the trial court obviously did not believe the defendant's version of the events, I would adhere to the trial court's factual findings that were reasonably based on the record. Accordingly, I would find that the defendant did not act in self-defense and should not completely escape liability for Landry's injuries. In any action for damages involving an injury, death, or loss, comparative fault principles should be applied under La. C.C. Article 2323. A proper application of Article 2323 *959 to the facts of this case involves a comparison of fault between plaintiff and defendant pursuant to Section A. The record supports a conclusion that the plaintiff's culpable conduct in causing the resulting injury makes Section C inapplicable to prohibit reduction of the plaintiff's damages in the present case. In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Thus, I would apportion fault according to the comparative degree of contribution to the plaintiff's injury.
NOTES
[1] "The Court cited no cases from this well-settled jurisprudence, and there don't appear to be any." David W. Robertson, The Aggressor Doctrine, 1 S.U. L.Rev. 82, 83 n. 5 (1975).
[2] Professor Robertson creates a table of pre-Morneau jurisprudence that compares behavior held sufficiently provocative to escape battery liability with other behavior which did not justify or excuse the use of force .... there is no pattern. Robertson, "The Aggressor Doctrine" at 97; Morneau v. American Oil Co., 272 So.2d 313 (La.1973); "The jurisprudence of Louisiana is by no means clear or settled on this point. Some judges have preferred to apply the aggressor doctrine strictly and have refused to grant any damages to the plaintiff if he were the original aggressor. Other cases have adopted a more humanitarian attitude and have attempted to give recovery by refusing to admit that the acts of the plaintiff amounted to aggression." Ferdinand F. Stone, Tort Doctrine in Louisiana: The Aggressor Doctrine, 21 Tulane L.Rev. 362, 367 (1947).
[3] See also 2 Planiol, Civil Law Treatise no. 869c, 899 (La.St.L.Inst.Transl.1959) quoted in Note, 34 La. L.Rev. 137, n. 16 (1973) ("Moreover it often happens that the fault of the victim is not the sole cause of the damage, and that the fault is shared. In that case the victim cannot be denied the right to sue under the pretext that he was at fault. The responsibility is apportioned according to the gravity of the faults committed respectfully by the author and by the victim and partial recovery takes place.")
[1] Interestingly, Professor Malone also notes:

The aggressor doctrine, on the other hand, is not geared to the attainment of any recognizable social objective. It is a mere recognition of hot temper aroused by provocationa toleration by government of the attitude of the frontiersman. When the notion of excessive force is incorporated into this doctrine, the result can be only to invite the court's personal estimate as to how vigorously a defendant should be permitted to reply in violence to a given insult. In a close case this must be difficult business for a conscientious judge, although it is obvious that some such modifier must be available to the courts if the aggressor doctrine is to be kept within manageable bounds. This writer would be happy if the entire aggressor doctrine were shelved in some museum of archaic legalisms. Gross insults and violations of privacy are now actionable torts everywhere, and the aggrieved person should seek his redress in the courtroom rather than in gladiatorial combat.
Wex S. Malone, Private Law, Work of the Louisiana Appellate Courts for the 1964-65 Term, 26 La. L.Rev. 517, 518 (1966)