SEXTON, Judge Pro Tem.
|T This case arises from a bar fight involving the plaintiffs, Juan Na Byrnside and Debra Byrnside, and the defendant, Paul Hutto. The plaintiffs appeal from a trial court judgment which found the defendant liable only for the injuries they suffered in the bar fight and not for Mr. Byrnside’s subsequent ruptured aortic aneurysm. The defendant also appeals from the trial court judgment. He complains of the trial court’s ruling that he did not act in self-defense and its failure to assess comparative fault against the plaintiffs. Both the plaintiffs and the defendant appeal from the trial court’s finding that the defendant’s liability insurance policy did not provide coverage for the damages sustained by the plaintiffs. We affirm the trial court judgment.
FACTS
There was a longstanding history of rancor between Mrs. Byrnside and Mr. Hutto. On the night of August 24, 2007, this hostility culminated in a physical altercation at the D’Arbonne Lake Lodge Lounge in Farmerville, Louisiana. While many of the witnesses were apparently intoxicated, the record indicates that Mrs. Byrnside and Mr. Hutto engaged in a verbal dispute which escalated into a physical confrontation. During the course of this incident, Mrs. Byrnside and her husband were both struck by Mr. Hutto. Mr. Byrnside was taken by ambulance to Union General Hospital in Farmerville. His medical records indicate that triage was started at 12:45 a.m. on August 25, 2007. He refused to undergo a head CT scan and was subsequently discharged against medical advice at approximately 2:26 a.m. However, at about 8:80 a.m. on August 26, 2007, he was admitted to the |2emergency room of St. Francis North Hospital in Monroe, where *606 he was diagnosed with a ruptured aortic aneurysm. He underwent emergency surgery which successfully repaired the aneurysm.
On December 5, 2007, the Byrnsides filed suit against Mr. Hutto. Amended petitions were subsequently filed; Mr. Hutto’s liability insurer, American National Property and Casualty Company of Louisiana (ANPAC), was added as a defendant.
A bench trial was held in March 2011. Written reasons for judgment were filed by the trial court on July 5, 2011. The court found no evidence that Mr. Hutto acted in self-defense as to either of the plaintiffs. As to the physical confrontation between the two men, it concluded that Mr. Hutto was at fault while Mr. Byrnside was totally free from fault. As to the incident between Mr. Hutto and Mrs. Byrnside, the court found that, while Mrs. Byrnside made inappropriate comments to Mr. Hutto, his physical reactions to her verbal statements were unreasonable and not justified. Therefore, the court found Mr. Hutto solely at fault.
As to Mr. Byrnside’s ruptured aortic aneurysm, the trial court found that the plaintiffs failed to meet their burden of proving that it was caused by the altercation. In so ruling, the court relied upon the medical testimony given by Mr. Byrn-side’s treating physicians, Dr. Larry Barr and Dr. Frank Sartor. Both doctors indicated in their deposition testimony that had the rupture been caused by a traumatic injury, it would have been apparent immediately or shortly after the trauma. None of the evidence-including Mr. Byrn-side’s medical records from Union General Hospital and the photos | -¡taken by the police to document his injuries-indicated that he was suffering any acute distress within the appropriate time period after the attack. Consequently, the trial court awarded damages only arising out of the barroom brawl, not the subsequent ruptured aortic aneurysm. Mr. Byrnside was awarded $16,000 in general damages and $1,316.59 in special damages for the treatment he received at Union General Hospital, or a total of $17,316.59. Mrs. Byrnside was awarded general damages of $7,000.
On the issue of insurance coverage, the trial court noted that Mr. Hutto’s policy with ANPAC contained a general exclusion for intentional losses and an endorsement which excluded damages resulting from the insured’s intentional and malicious acts. The court found coverage excluded under the terms of both provisions.
Judgment in conformity with the written reasons was signed on August 25, 2011.
As previously indicated, both parties have appealed.
CAUSATION
The plaintiffs assert that the trial court was manifestly erroneous in failing to find that Mr. Byrnside’s ruptured aortic aneurysm was the result of Mr. Hutto’s physical attack. In particular, they argue that the trial court erred in not applying the presumption of causation set forth in Housley v. Cerise, 579 So.2d 973 (La.1991).

Law

In civil cases, a trial court’s findings of fact will not be disturbed on appeal unless the reviewing court finds that they are clearly wrong or |4manifestly erroneous. Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993); Dixon v. Tucker, 47,113 (La.App.2d Cir.5/16/12), 92 So.3d 1100, writ not considered, 2012-1838 (La.11/9/12), 100 So.3d 824. To reverse a factfinder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and *607 that the record establishes that the finding is clearly wrong. Stobart, supra.
Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Further, when findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Roseü, supra.
In Louisiana’s three-tiered court system, fact finding is allocated to the trial court, and its evaluations of credibility, even when based on depositions offered in lieu of live testimony, are accorded great deference. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal. Holley Homestead Trust v. Harrison, 44,149 (La.App.2d Cir.4/15/09), 11 So.3d 511.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La.2/20/95), 650 So.2d 757. Proof must be by a preponderance of the evidence. Maranto, | ¿supra. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto, supra. Causation is a question of fact and is subject to the manifest error standard of review. Green v. K-Mart Corp., 2003-2495 (La.5/25/04), 874 So.2d 838; Henderson v. Gregory, 47,086 (La.App.2d Cir.6/20/12), 93 So.3d 818, writ denied, 2012-1695 (La.11/2/12), 99 So.3d 671.
To obtain the benefit of the Housley presumption, the plaintiff must show: (1) that he or she was in good health prior to the accident at issue; (2) that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward; and (3) through evidence, either medical, circumstantial or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. Housley v. Cerise, supra; Henderson v. Gregory, supra. If the plaintiff can show these three elements, then he is entitled to a presumption of causation and the burden of proof shifts to the defendant to prove some other particular incident could have' caused the injury of which the plaintiff complains. If the plaintiff cannot show these three elements, he or she is not entitled to a presumption of causation and the burden of proof does not shift to the defendant. Henderson v. Gregory, supra. The application of the Housley presumption of causation to the facts is also a question of fact and subject to manifest error review. Henderson v. Gregory, supra.
| eJDiscussion
The plaintiffs assert that their testimony established that Mr. Byrnside began suffering symptoms indicative of the ruptured aortic aneurysm shortly after the bar incident, and that the trial court erred in not relating the rupture to the defendant’s physical attack upon Mr. Byrnside.
The medical evidence presented by the plaintiffs consisted of his medical records from Union General Hospital and St. Francis North Hospital, as well as the depositions of his treating physicians, Dr. Larry Barr and Dr. Frank Sartor. Dr. Barr, a general surgeon, was on call at St. Francis the second time Mr. Byrnside was seen in an emergency room after the alter *608 cation. When he realized that Mr. Byrn-side had a ruptured abdominal aneurysm, he called Dr. Sartor, a general/vascular surgeon. They performed surgery on Mr. Byrnside to repair his aneurysm.
In his deposition, Dr. Barr explained that an aneurysm is a dilated or expanded weak part in a blood vessel. The most common cause of an aortic aneurysm like Mr. Byrnside’s is arterial sclerosis, or a buildup of plaque initially on the inner lining of the blood vessel. Over time, the blood vessel expands, and the muscular wall weakens, becomes thinner and eventually ruptures. The risk factors for developing arterial sclerosis include diet, smoking and alcohol abuse, with smoking being the number one risk factor. According to Dr. Barr, a person can have an aneurysm for years. He opined that Mr. Byrnside had his aneurysm before the incident at the bar. Dr. Barr testified that a rupture of an aneurysm is usually spontaneous. When asked if trauma was a cause he saw for ruptures, Dr. Barr responded, “Possibly, it 17could be.” He said he might have seen a patient with an aortic aneurysm which had ruptured due to blunt force trauma, but he could not recall a specific incident. Furthermore, if trauma actually caused a rupture, he believed that it would occur immediately. Within seconds, the person would have symptoms such as sudden and severe abdominal pain, fainting, sweating, and low blood pressure.
Dr. Barr reviewed Mr. Byrnside’s Union General records from the night of the assault. The findings on the gastrointestinal portion of the physical exam — no pain on movement or palpation, no tenderness, and normal bowel sounds — led him to believe that “nothing serious” was going on inside Mr. Byrnside’s abdominal cavity at that time. The only finding that concerned him was a low blood pressure reading with a slightly elevated heart rate. However, the heart rate went down and the blood pressure was normal when recorded later. Dr. Barr stated that the low blood pressure reading could have been secondary to alcohol because intoxication causes blood pressure to drop. Dr. Barr noted that the Union General records indicated that Mr. Byrnside was intoxicated.
When asked if it was possible that a blunt force trauma could accelerate the bursting process if a person had a preexisting aneurysm, Dr. Barr stated that it was possible, but to his knowledge there was no way to make that determination. While he could not rule out the possibility, Dr. Barr stated that based on Mr. Byrn-side’s Union General medical records, he saw nothing to direct attention to his abdomen. Additionally, nothing in the emergency 18room record indicated that he was suffering from a ruptured aortic aneurysm at the time of his discharge.
Dr. Sartor testified in his deposition that once an aneurysm reaches a certain size, the mechanism by which it ruptures is very unpredictable. A patient with a ruptured aneurysm would be expected to have immediate symptoms, and the rupture would be sufficiently traumatic for the person to know that it had occurred. Dr. Sartor stated that, if a rupture is related to a traumatic incident, it should be apparent very shortly after the incident, within an hour.
According to Dr. Sartor’s review, the Union General records do not indicate trauma to the chest, abdomen or torso. When the patient presented, his vital signs were abnormal in that he had low blood pressure and a slightly elevated heart rate. When he was discharged, Mr. Byrnside’s blood pressure was in an acceptable range while his heart rate was still a bit high. Dr. Sartor observed that the medical records indicated that Mr. Byrnside’s blood alcohol level was high. In Dr. Sartor’s *609 opinion, the patient was not suffering from a ruptured aneurysm when he was in the Union General emergency room.
Dr. Sartor testified that the main reason an aneurysm ruptures is that, as a degenerative process, it continually expands; once the pressure inside overcomes the integrity of the thinned-out aorta, it will rupture. Uncontrolled blood pressure is an external factor that can impact the condition. Although he could not “absolutely” exclude it, Dr. Sartor stated that in his 20 years of practice, he has never seen an episode where some type of external force caused an aneurysm to rupture.
laFor the Housley presumption to be applicable, the plaintiffs are required to show three conditions. The first of these is that the plaintiffs must show that Mr. Byrnside was in good health prior to the accident at issue. The record demonstrates that the plaintiff failed to make such a showing. To the contrary, Mr. Byrnside, who was 65 years old at the time of the bar altercation, testified that he began smoking when he was 20 or 21 years old and that he smoked between one and one-half to four packs of cigarettes per day. He had been diagnosed with chronic obstructive pulmonary disease years before the bar incident. Dr. Barr, one of Mr. Byrnside’s treating physicians, stated that smoking is the number one factor contributing to arterial sclerosis, the most common cause for developing the kind of aneurysm Mr. Byrnside had.
Additionally, the third Housley condition requires the plaintiffs to show, through evidence, either medical, circumstantial or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. The plaintiffs have also failed to prove this element.
Mr. Byrnside’s own treating physicians — the only medical experts to testify — both opined that symptoms of a ruptured aneurysm would develop rapidly. Mr. Byrnside would have been at Union General shortly after or during the time periods they recited. Based upon their review of the Union General medical records, neither believed Mr. Byrnside was suffering from a ruptured aortic aneurysm at the time of his discharge from that hospital. While indicating that it might be possible for trauma to cause an aortic | ;naneurysm to rupture, the testimony of these medical experts failed to show a reasonable possibility that such an occurrence happened in the instant ease.
The plaintiffs also contend that the circumstantial evidence and common knowledge proved a reasonable possibility of causation. However, Dr. Sartor testified that in 20 years he had never seen external force cause such a rupture, and Dr. Barr could not recall ever treating a trauma-induced ruptured aneurysm. Such testimony tends to undermine the plaintiffs’ assertion that it is “common knowledge” that trauma can cause an aneurysm to rupture.
As to the circumstantial evidence, the plaintiffs assert that they proved that Mr. Hutto kicked Mr. Byrnside in the abdomen and that he soon began manifesting symptoms (low blood pressure, pain, nausea) indicative of a ruptured aortic aneurysm. Review of the record reveals that there was testimony from some witnesses that Mr. Hutto kicked Mr. Byrnside in the abdomen after pushing or knocking him down on the bar floor.[1] However, there was no clear consensus of where he was *610 kicked or the degree of force with which he was kicked. While the Union General medical records showed that Mr. Byrn-side’s blood pressure was low when it was taken shortly after his arrival, they also showed that it was normal by the time he left the hospital. Additionally, Dr. Ban-indicated that the low blood pressure might have been related to the patient’s high alcohol level. Mrs. Byrnside testified that her husband felt sick within 10 minutes of getting home. However, in | nher deposition she said they got home at about 2:30 a.m., and he began feeling sick at 11:30 a.m.
After a careful review of the record, we are unable to say that the trial court was manifestly erroneous in not applying the Housley presumption in the instant case. Nor do we find manifest error in the trial court’s determination that the plaintiffs failed to carry their burden of proving that the physical altercation with Mr. Hutto caused Mr. Byrnside’s ruptured aortic aneurysm.
FAULT
Mr. Hutto argues that the trial court erred in rejecting his contention that he acted in self-defense and in failing to assess comparative fault against the plaintiffs.

Law

The trial court’s apportionment of fault is a factual determination subject to the manifest error standard of review. Bennett v. Louisiana Farm Bureau Cas. Ins. Co., 43,216 (La.App.2d Cir.4/30/08), 983 So.2d 966. An appellate court must give deference to the allocation of fault as determined by the trier of fact. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
Under Louisiana jurisprudence, in order to succeed on a claim of self-defense (not involving deadly force), there must be an actual or reasonably apparent threat to the claimant’s safety and the force employed cannot be excessive in degree or kind. Landry v. Bellanger, 2002-1443 (La.5/20/03), 851 So.2d 943. The privilege of self-defense is based on the prevention of 112harm to the actor, not on the desire for retaliation or revenge, no matter how understandable that desire. Landry v. Bellanger, supra.

Testimony

In his testimony, Mr. Hutto maintained that he acted solely to protect himself and his date and that he only intended “to clear a path to get out the' door.” He stated that Mrs. Byrnside initiated the confrontation. Other witnesses corroborated this assertion. She came up to him when he and his date were seated at the bar and asked if he was Paul Hutto. He replied affirmatively, and she then began to make verbal threats. According to Mr. Hutto’s account, she threatened that she and her kids would kill him, even if they had to wait until he was an old man. He replied that they would not be having this conversation if her kids weren’t thieves and her kids would not be in prison if she had not condoned them stealing from him. At this point, he testified, she “really lost it.” Mr. Hutto further testified that Mrs. Byrnside spit in his face; however, no witness, including Mr. Hutto’s date, observed such an action.
At some point, Mr. Byrnside also approached and stood nearby with a hand in his pocket. Mr. Hutto said he didn’t know if Mr. Byrnside had a gun in his pocket. He asserted that both of the Byrnsides threatened him. According to Mr. Hutto, he pushed both of the Byrnsides because they had him “pinned against the bar.” He said he pushed Mr. Byrnside when Mr. Byrnside took a step toward him after he pushed Mrs. Byrnside. Mr. Hutto denied *611 kicking Mr. Byrnside in the side but admitted putting his foot on the man’s chest as he lay on the floor and telling him to stay down. Shortly | ^thereafter, Mr. Byrnside got up and was in the doorway with someone holding him. He interpreted this as meaning that Mr. Byrnside was “coming after him.” Mr. Hutto testified that he said to get out of his way and told the man holding Mr. Byrnside to let him go. When the man complied, Mr. Hutto hit Mr. Byrnside with a closed fist and left the bar with his date.
Other witnesses — many of whom admitted to consuming alcohol during the evening — saw the events differently. Most testified that they saw physical contact between Mr. Hutto and Mrs. Byrnside; the descriptions of this contact varied from a push to a punch. Some witnesses thought Mr. Hutto kicked her too. There was some testimony that Mrs. Byrnside wagged her finger in Mr. Hutto’s face or touched his chest with her finger. There was no other evidence indicating that Mrs. Byrnside initiated any physical contact with Mr. Hutto.
Mr. Hutto was the only witness to testify that Mr. Byrnside threatened him. Another witness, Tammy Owens, had stated in her deposition that Mr. Byrnside came at Mr. Hutto after his physical contact with his wife and that they “had words.” At trial, she testified that she did not recall the men exchanging words. Several witnesses described Mr. Byrnside as moving forward after his wife was physically assaulted. However, others denied seeing any aggressive or otherwise provocative action on his part.

Discussion

The trial court was faced with conflicting testimony which required it to make numerous credibility calls. It concluded that there was no credible evidence that Mr. Byrnside made any threatening gestures or remarks to Mr. |uHutto or that he was armed. The court further concluded that Mr. Hutto struck Mr. Byrnside and, while Mr. Byrnside was on the ground, struck him again without provocation. Thereafter, when Mr. Byrnside was on his feet and was being either held up or back by someone, Mr. Hutto did not walk past Mr. Byrnside and leave the bar. Instead he instructed whoever was holding Mr. Byrnside to release him and then proceeded to hit him with his fist. Based upon these fact findings, the trial court held that Mr. Hutto was totally at fault and that he was not acting in self-defense.
As to Mrs. Byrnside, the trial court noted that while she made inappropriate and arguably provocative remarks to Mr. Hut-to, there was no credible evidence that she hit him or did anything to cause him to think that she would hit him. Additionally, by Mr. Hutto’s own admission, her alleged threats to kill him “even if she had to wait until he was old” did not involve a risk of imminent harm. Based upon the totality of the evidence, the trial court found that Mr. Hutto’s physical reactions to Mrs. Byrnside’s verbal statements were unreasonable and unjustified. Thus, the court assessed all fault to Mr. Hutto and concluded that he did not act in self-defense.
We find no manifest error in the trial court’s determination that Mr. Hutto was solely at fault in the physical altercations involving the' Byrnsides. Additionally, we find no manifest error in the trial court’s determination that Mr. Hutto did not act in self-defense. Mr. Hutto’s response to Mrs. Byrnside’s verbal assailment was unreasonable, as were his repeated, unprovoked physical contacts with her husband. The evidence does not show that there was an actual or reasonably apparent threat to Mr. Hutto’s safety.
*612 | ^INSURANCE COVERAGE
The plaintiffs and Mr. Hutto contend that the trial court erred in finding that Mr. Hutto’s insurance policy excluded coverage because his actions were intentional and/or malicious. They cite Mr. Hutto’s testimony that he acted purely out of a desire to protect himself and his date and to clear a pathway to exit the bar; he also testified that he never intended to cause any injuries to the plaintiffs.

Policy provisions

The ANPAC policy included a general policy exclusion provision for intentional losses, which stated as follows:
WE do not cover loss resulting directly or indirectly from one or more of the following exclusions, regardless of any other causes or events contributing concurrently or in any sequence to the loss:
[[Image here]]
5. Intentional Loss, meaning loss that results from an act committed by or at the direction of any INSURED with the intent to cause loss.
The endorsement excluding coverage for intentional acts stated as follows:
Sections A and B do not apply to BODILY INJURY/PROPERTY DAMAGE or MEDICAL EXPENSES: ...
6. expected by, caused intentionally by or at the direction of any INSURED, or resulting from intentional and malicious acts of any INSURED. However, this exclusion does not apply to BODILY INJURY, PROPERTY DAMAGE or MEDICAL EXPENSES arising out of the reasonable use of force to protect people or property; ...

Law

An insurance policy is a contract between the insured and the insurer and has the effect of law between the parties. Because an insurance policy is a contract, the rules established for the construction of written instruments | inapply to contracts of insurance. The parties’ intent, as reflected by the words of an insurance policy, determines the extent of coverage, and the intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used in the policy, unless the words have acquired a technical meaning. Washington v. McCauley, 45,916 (La.App.2d Cir.2/16/11), 62 So.3d 173, writ denied, 2011-0578 (La.4/29/11), 62 So.3d 115.
If the language in an insurance contract is clear and unambiguous, the agreement must be enforced as written and a reasonable interpretation consistent with the obvious meaning and intent of the policy must be given. Washington v. McCauley, supra. Exclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured. Canterberry v. Chamblee, 41,940 (La.App.2d Cir.2/28/07), 953 So.2d 900. The insurer has the burden of proving that a loss is subject to a policy exclusion. Canterberry v. Chamblee, supra.

Discussion

In its well-articulated written reasons for judgment, the trial court considered the two provisions in the ANPAC policy which excluded coverage for an insured’s intentional acts. First, it examined the general policy exclusion for “intentional loss,” which defined that term as meaning “loss that results from an act committed by or at the direction of any [insured] with the intent to cause loss.” The court reviewed Mr. Hutto’s separate acts of intentional contacts with the plaintiffs — intentionally pushing each of them to the ground, intentionally placing his foot on and/or kicking Mr. Byrnside in the upper chest while suggesting he stay *613 down, and intentionally hitting Mr. |17Byrnside in the face with his fist after instructing the person holding Mr. Byrn-side to release him. It found the general exclusion applicable because the injuries that the plaintiffs proved were caused by Mr. Hutto’s actions — cuts, bruises and abrasions — were of the type and degree that one could reasonably expect from Mr. Hutto’s actions. The court deemed his actions and the resulting injuries to be intended by him.
By his own count, the 50-year-old Mr. Hutto testified that he had been in about 17 fights since childhood. He conceded that if a person was pushed down to the ground, one might expect that person to sustain an injury. He admitted that he did not accidentally bump into Mrs. Byrn-side; he intended to push her. Although he adamantly denied kicking Mr. Byrnside, he agreed that a person kicking someone in the abdomen might expect that the action could cause internal injury. Additionally, he testified that he meant to make contact when he hit Mr. Byrnside. In view of Mr. Hutto’s own testimony, we cannot fault the trial court’s analysis and conclusion that the cuts, bruises, and abrasions suffered by the Byrnsides in the altercation were reasonably expected and were intended by Mr. Hutto. Thus, the general policy exclusion was applicable.
The trial court concluded that Mr. Hut-to’s actions were also excluded under the endorsement. In so ruling, the court cited the history of discord among the parties which appeared to involve malice and its previously mentioned finding that self-defense was inapplicable. Again, we cannot find manifest error in the trial court’s conclusion. The intentional acts endorsement of the ANPAC policy excludes coverage arising from the | ^insured’s “intentional and malicious acts”; however, the exclusion does not apply in cases of self-defense. Although Mr. Hutto claimed to have acted as he did to flee the Byrnsides’ aggression and protect himself and his date, the evidence of his repeated physical contacts with the plaintiffs belies that contention. Particularly compelling is the evidence that, as Mr. Hutto left the bar, he instructed the persons holding Mr. Byrnside to release him and that he then immediately hit Mr. Byrnside in the face. Furthermore, in his own testimony, Mr. Hutto freely admitted that he and Mrs. Byrnside hated each other and had malice for each other.
We find no error in the trial court’s ruling that the ANPAC policy did not provide coverage for Mr. Hutto’s actions against the Byrnsides.
DAMAGES
The plaintiffs argued that the damages awarded to them were inadequate because the award compensated them only for their injuries arising directly from the bar altercation and not for the losses they sustained as a result of Mr. Byrnside’s ruptured aortic aneurysm.
It is well settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104.
We found no manifest error in the trial court’s ruling on the causation issue concerning the ruptured aneurysm. Likewise, we find no manifest error in the damages awarded to the plaintiffs. The trial court’s awards to the plaintiffs, particularly the one to Mrs. Byrnside, are adequate for the immediate injuries received in the bar altercation.
^CONCLUSION
The trial court judgment is affirmed. Costs of this appeal are assessed one-half *614 to Juan Na Byrnside and Debra Byrnside and one-half to Paul Hutto.
AFFIRMED.

. On the other hand, there was also testimony that Mr. Hutto merely placed his foot on Mr. Byrnside’s chest and told him to stay down.