CORRECTED COPY

| | | |
|---|---|---|
| **DARREN LOMBARD** | * | **NO. 2023-CA-0746** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **ELTON NOBRE AND JOSE NOBRE** | * | **FOURTH CIRCUIT** |
| | * | |
| | * | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-03786, DIVISION "F-14"
Honorable Jennifer M. Medley
* * * * * *
**Judge Joy Cossich Lobrano**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)

*LEDET, J., CONCURS IN THE RESULT*

James C. Cronvich
Clarence F. Favret, III
Jordan T. LeBlanc
FAVRET CARRIERE CRONVICH LLC
650 Poydras Street, Suite 2300
New Orleans, LA 70130

      COUNSEL FOR PLAINTIFF/APPELLANT

Jimmy A. Castex, Jr.
John B. Esnard, III
W. Lee Kohler
CASTEX ESNARD, L.L.C.
650 Poydras Street, Suite 2415
New Orleans, LA 70130

      COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
**JUNE 18, 2024**

This is an intentional tort battery claim implicating comparative fault.

Plaintiff/appellant, Darren Lombard ("Plaintiff"), appeals the July 11, 2023 judgment of the district court, which awarded damages in his favor, found him twenty (20%) percent at fault, and determined that policy exclusions barred insurance coverage for his claims. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

This incident arises from a neighborhood altercation on April 25, 2014, between Plaintiff and defendants/appellees, Elton Nobre ("Elton") and Elton's father, Jose Nobre ("Mr. Nobre") (collectively the "Nobres"). On April 21, 2015, Plaintiff filed a petition for damages alleging that he was driving his vehicle when Mr. Nobre stepped into the street in front of him and began shouting while pounding on Plaintiff's vehicle. Plaintiff alleged that he exited his vehicle when Elton approached Plaintiff, striking him in the face and knocking him to the ground. Plaintiff alleged that, as a result, he sustained personal injuries to his face,

head, neck, back, and knees. In connection with these events, Elton was arrested and convicted of simple battery.[1]

On July 12, 2022, the Nobres filed a third party demand against the Louisiana Insurance Guaranty Association ("LIGA") in its capacity as statutory obligor for Mr. Nobre's homeowners' insurer, Southern Fidelity Insurance Company ("SFIC"), which was in receivership. The SFIC policy had both an "expected or intended injury" exclusion and "criminal act" exclusion, which LIGA argued applied to bar coverage.

The case proceeded to trial on March 27, 2023. The parties jointly introduced into evidence the records of Elton's criminal proceeding; the SFIC policy; photographs depicting Plaintiff's face and hand lacerations and Elton's face and arm lacerations; and Plaintiff's medical records and medical bills. Plaintiff and Elton were the only witnesses to testify at trial.

Plaintiff gave the following account of the incident. Plaintiff was driving when he noticed vehicles ahead of him proceeding slowly and driving around Mr. Nobre, who was standing in the middle of the street. When Plaintiff tried to drive around Mr. Nobre, Mr. Nobre lunged at Plaintiff's vehicle and "bang[ed]" on the hood and roof. Plaintiff rolled down the window to talk to Mr. Nobre, but could not understand him, and Mr. Nobre began punching Plaintiff's hands through the window. Plaintiff was unsure whether he struck Mr. Nobre with the vehicle, and

---

[1] "Simple battery is a battery committed without the consent of the victim." La. R.S. 14:35(A). "Battery is the intentional use of force or violence upon the person of another. . . ." La. R.S. 14:33.

Plaintiff exited the vehicle to "talk to him and calm him down." Plaintiff denied raising his voice, but stated that Mr. Nobre was shouting. He also denied being physically aggressive with Mr. Nobre, though he believed that Mr. Nobre bumped him. Plaintiff testified that he is larger than Mr. Nobre.

Elton then approached Plaintiff, stating "you better get out of here before you get hurt." Plaintiff started to turn and walk away toward his vehicle when Elton struck Plaintiff in the jaw. According to Plaintiff, "it was like the lights went out," but he could still hear. He was next on the ground "tussling" with Elton. He recalled at some point being on top of Elton and another time Mr. Nobre being on top of him. His initial injuries were pain in his face, knuckles, and elbows. He stated that, where Elton struck him, his tooth went through his lip. Neighbors who were nearby gave Plaintiff ice and returned his glasses, which had come off during the struggle. Thereafter, Plaintiff called the police, and Elton was arrested.

Elton testified to a different version of the altercation. He explained that he lives with Mr. Nobre – his eighty-five-year-old father – as well as his mother, his wife, and his three children. At the time of the incident, Mr. Nobre was recovering from open-heart surgery and had previously undergone three brain surgeries after a work-related accident. Elton was under the impression that Mr. Nobre was outside with his grandchildren, who were riding bikes. Elton did not see Mr. Nobre banging on Plaintiff's vehicle.

Elton was in his backyard when his wife "[came] running" and said that Mr. Nobre "is about to get beat up by somebody on the street." Elton approached from

3

his driveway and saw "an oversized, grown man yelling at my father. And my father was also yelling back at him." Next, Plaintiff pushed Mr. Nobre. Elton tried to position himself between Plaintiff and Mr. Nobre, but the yelling continued. He tried to convince Mr. Nobre to go inside or have his wife take Mr. Nobre inside. Elton denied that Plaintiff stepped away to his vehicle at the time Elton struck Plaintiff. According to Elton, Plaintiff "turned his aggression on" Elton, Plaintiff pushed Elton, and Elton "slapped" Plaintiff, which made Plaintiff's glasses fall. Plaintiff then tackled Elton, and Elton fell to the ground onto his back. The struggle lasted for fifteen minutes, and Elton was hit twice, though he was not sure what hit him.

Elton explained that his initial motivation for involving himself in this incident was protecting his father's health, as Mr. Nobre was recovering from open-heart surgery, and Elton did not want Mr. Nobre to get hurt. Elton described that he and Plaintiff are approximately the same size, and that both men are larger than Mr. Nobre. Elton testified that he was trying to diffuse the situation, but when Plaintiff pushed Elton, he felt that he had to defend himself. In response to questioning from counsel, Elton acknowledged that hitting Plaintiff was "absolutely not" "the right thing to do[.]" He testified that if he could change things, he would, and that he apologized to Plaintiff.

On July 11, 2023, the district court rendered judgment with reasons, which assessed Plaintiff with twenty (20%) percent comparative fault; awarded Plaintiff $2,500 in general damages and $1,065 in medical expenses, reduced by twenty

(20%) percent due to comparative fault; and dismissed all claims against Mr. Nobre and against LIGA. This appeal followed.

## LAW AND ANALYSIS

### Assignments of Error

On appeal, Plaintiff raised the following assignments of error:

1.  The trial court's finding that [Plaintiff] was only entitled to $2,500 in general damages was an abuse of discretion.

2.  The trial court's finding that [Plaintiff] was 20% at fault for his damages and the judgment[] reducing his damages awards accordingly [were] manifest error.

3.  The trial court's finding dismissing the third party demand against LIGA was manifest error.

### Comparative Fault

We first examine Assignment of Error No. 2, the applicability of the comparative fault statute, La. C.C. art. 2323, and the district court's allocation of fault. Plaintiff asserts that the district court manifestly erred in finding him twenty (20%) percent at fault for his injuries.

Determinations and allocations of comparative fault are findings of fact, which are subject to the "manifest error" or "clearly wrong" standard of review on appeal. *Murphy v. City of New Orleans*, 09-0567, p. 9 (La. App. 4 Cir. 11/12/09), 25 So.3d 956, 961. A court of appeal may not set aside a district court's findings of fact in the absence of "manifest error" or unless it is "clearly wrong." *Snider v. Louisiana Med. Mut. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323 (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)). "[W]here there is conflict

5

in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id.* "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Cosby v. Holcomb Trucking, Inc.*, 05-0470, p. 13 (La. 9/6/06), 942 So.2d 471, 479 (citing *Rosell*, 549 So.2d at 844; *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217, p. 11 (La. 4/3/02), 816 So.2d 270, 278-79). In cases where documents or objective evidence so contradict the witness' story, the appellate court may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. *Id.* (citing *Rosell*, 549 So.2d at 844-45). However, "where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." *Id.*

While the manifest error standard applies to appellate review of facts found below, the appellate court is also required to examine the record for legal error. *In re Succession of Sporl*, 04-1373, p. 4 (La. App. 4 Cir. 4/6/05), 900 So.2d 1054, 1058. When a district court makes one or more prejudicial legal errors, which interdict the fact-finding process, the manifest error standard no longer applies, and, where the record is complete, the appellate court must undertake its own *de novo* review of the record. *Id.*, 04-1373, p. 5, 900 So.2d at 1058 (citing *Evans v. Lungrin*, 97-0541, 97-0577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735; *McLean v.*

*Hunter*, 495 So.2d 1298, 1303-04 (La. 1986)). A "*de novo* review should be limited to consequential errors; that is, the error prejudiced or tainted the trial court's finding with regard to a material factual issue." *Cipolla v. Cox Commc'ns Louisiana, LLC*, 19-0509, p. 7 (La. App. 4 Cir. 8/5/20), 305 So.3d 911, 916 (quoting *Joseph v. Williams*, 12-0675, p. 22 (La. App. 4 Cir. 11/14/12), 105 So.3d 207, 221)(other citations omitted). In contrast, error is harmless where it is "trivial, formal, merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case." *Duzon v. Stallworth*, 01-1187, p. 31 (La. App. 1 Cir. 12/11/02), 866 So.2d 837, 860-61 (quoting *Buckbee v. United Gas Pipe Line Co., Inc.*, 561 So.2d 76, 85 (La. 1990)(other citations omitted)). Harmless error does not prejudice or taint the validity of the verdict and is not sufficient to trigger this Court's *de novo* review. *Succession of Gendron*, 21-14, p. 14 (La. App. 5 Cir. 6/23/21), 325 So.3d 584, 596.

As a preliminary matter, we analyze whether the district court correctly applied the law of comparative fault to this intentional tort.

Louisiana Civil Code article 2315 provides that a person may recover damages for injuries caused by a wrongful act of another. The fault concept includes the intentional tort of battery. *Landry v. Bellanger*, 02-1443, p. 6 (La. 5/20/03), 851 So.2d 943, 949. Battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact ..." *Id.* (quoting *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987)). "The defendant's intention need not be malicious nor need it be an intention to inflict actual

7

damage." *Id.* "It is sufficient if the defendant intends to inflict either a harmful or offensive contact without the other's consent." *Id.* To escape liability for damages resulting from a battery, the defendant may prove that "his actions were privileged or justified, such as self-defense" under La. R.S. 9:2800.19.[2] *Id.*, 02-1443, p. 15, 851 So.2d at 954.

The plaintiff must first show a battery occurred by proving "all *prima facie* elements of the tort, including lack of consent to the invasive conduct." *Id.* Traditionally, "under the aggressor doctrine, the plaintiff [was] deemed to have consented to the physical retaliation by provoking the defendant, thereby relieving the defendant of liability for any damages that may result." *Id.*, 02-1443, p. 13, 851 So.2d at 953. The aggressor doctrine precluded tort recovery in an "all or nothing" approach. *Id.* The aggressor doctrine was a form of implied consent.

In *Landry*, the Supreme Court held that the aggressor doctrine is inconsistent with the adoption of Louisiana's pure comparative fault regime. *Id.,* 02-1443, p. 18, 851 So.2d at 956. The Supreme Court reasoned that the actions of the plaintiff

---

[2] La. R.S. 9:2800.19 states:

**§ 2800.19. Limitation of liability for use of force in defense of certain crimes**

A. A person who uses reasonable and apparently necessary or deadly force or violence for the purpose of preventing a forcible offense against the person or his property in accordance with R.S. 14:19 or 20 is immune from civil action for the use of reasonable and apparently necessary or deadly force or violence.

B. The court shall award reasonable attorney fees, court costs, compensation for loss of income, and all expenses to the defendant in any civil action if the court finds that the defendant is immune from suit in accordance with Subsection A of this Section.

can adequately be condemned through concepts of comparative fault, duty/risk, and privileges, which would eliminate the inequalities inherent in the "all or nothing" approach of the aggressor doctrine. *Id.*, 02-1443, p. 13, 851 So.2d at 953.

The *Landry* case effectively removed the bar to recover damages under the former expansive analysis of "consent." Courts are now directed to perform a comparative fault analysis when the plaintiff does not "consent" to the battery but nevertheless provoked physical retaliation by the defendant who does not enjoy immunity from liability or privilege under La. R.S. 9:2800.19 due to unreasonable retaliatory force. "[A]bsent a qualifying privilege, any provocative or aggressive conduct on the part of the plaintiff should be incorporated into the allocation of fault by the trier of fact." *Landry*, 02-1443, p. 16, 851 So.2d at 955. Under a more limited, post-*Landry* "consent" theory, courts must consider whether the plaintiff "voluntarily participate[d] in an altercation."[3] Inquiries as to the

_____

[3] *Guillot v. Guillot*, 14-364, pp. 8, 14 (La. App. 3 Cir. 12/23/14), 161 So.3d 841, 847, 850. In intentional tort battery cases after *Landry*, in determining whether the plaintiff is barred from recovery for failing to prove a battery occurred due to the plaintiff consenting to the battery, "consent" analyses are now limited to inquiries as to the willing and voluntary nature of the altercation. *See, e.g., Guillot*, p. 14, 161 So.3d at 850, where the court held that the plaintiff consented to the battery by the defendant and was precluded from applying the comparative fault doctrine because he failed to prove that a battery occurred. The court noted that the plaintiff consented to be hit as soon as he exited his vehicle because he told his wife to call the police after taking a boat that he was not supposed to take and he continued toward the defendant knowing trouble was coming. *Id. See also Richard v. Mangion*, 535 So.2d 414, 416 (La. App. 3d Cir. 1988), where the plaintiff and the defendant showed up to a rope swing prepared to engage in "fisticuffs" and fully prepared and contemplated the physical altercation. Classmates advanced the idea of a fight, and the plaintiff in anger challenged the defendant to fight. *Id.* The court concluded that by showing up to the rope swing, the plaintiff implied that he was willing to engage in a fight and incur blows because when the plaintiff left his house to meet the defendant at the rope swing, he knew that showing up would demonstrate his willingness and voluntariness to fight. *Id.* The court recognized that two parties can expressly consent to fight. *Id.*, 535 So.2d at 416-17.

reasonableness of the plaintiff's initial actions and defendant's retaliatory actions are reviewed under a comparative fault analysis.

Accordingly, comparative fault applies in intentional tort battery cases when both: (1) the plaintiff does not consent to the battery; and (2) the defendant fails to prove self-defense under La. R.S. 9:2800.19 immunity.[4]

Elton did not appeal the judgment, and no party directly raised consent or immunity under La. R.S. 9:2800.19 as issues on appeal. The district court found it "undisputed that Elton Nobre committed a battery, or intentional tort," against Plaintiff and, thus, whether he consented to the battery is not at issue. However, the district court issued a single document entitled "judgment with reasons,"[5]

---

[4] "Our reading of *Landry* is that the supreme court specifically held that comparative fault does apply, except in cases involving the defense of *consent,* or the existence of a privilege, like self-defense." *Guillot*, 14-364, p. 14, 161 So.3d at 850 (emphasis in original). In *Landry*, 02-1443, p. 11, 851 So.2d at 952, the Supreme Court explained:

> Hence, the existence of consent means the defendant did not commit a tort and the existence of a privilege means the defendant's tort was justified. [David] Robertson, *Louisiana's Law of Comparative Fault: A Decade of Progress,* [1 Louisiana Practice Series 5,] at 6-7." Conversely, Louisiana's aggressor and mitigation doctrines are victim-fault defenses. *Id.* Neither theory implies that no tort has occurred or that the defendant's conduct was justified, but instead seek to penalize the victim. *Id.* As Robertson then points out, "On this analysis the percentage-fault approach should replace *both* the aggressor doctrine and the mitigation doctrine . . . . In this way the comparative fault principles will be confined to the job they were designed to do—taking victim fault into account." Robertson, *The Louisiana Law of Comparative Fault: A Decade of Progress, supra,* at 7."

[5] Under La. C.C.P. art. 1918(B), "[w]hen written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment." "[R]easons for judgment are merely an explication of the trial court's determinations. They do not alter, amend, or affect the final judgment being appealed. . . ." *Wooley v. Lucksinger*, 09-0571, pp. 77-78 (La. 4/1/11), 61 So.3d 507, 572. While a court of appeal is entitled to use reasons for judgment "to gain insight into the district court's judgment" – to the extent such "reasons may, or may not, have been helpful in that regard" – "the job of the appellate court [is] to review the district court's judgment, not its reasons for judgment." *Id.*, 09-0571, p. 78, 61 So.3d at 572.

stating both that Elton acted in "self-defense of his elderly father" and in "self-defense, for purposes of civil liability."[6] Outside of these fleeting references to self-defense, nothing in the judgment or reasons signifies that the district court applied the law of self-defense, justifiable battery, or deemed Elton immune from liability under La. R.S. 9:2800.19. *See generally Landry*, 02-1443, pp. 15-16, 851 So.2d at 954-55. Instead, the district court's decree explicitly apportioned twenty (20%) percent fault to Plaintiff, and explained in its reasons that it apportioned eighty (80%) percent fault to Elton. Thus, we find that comparative fault applies and affirm the district court's allocation of fault to Plaintiff of twenty (20%) percent for the following reasons.

Louisiana Civil Code article 2323 provides:

---

[6] In intentional tort battery cases, the application of the laws of consent, self-defense, and comparative fault are interrelated and often improperly conflated. Due to their overlapping nature, particularly since the case of *Landry*, a discussion of each legal concept should be separate and in a specific order as follows: first, determine if "consent" was given by the plaintiff to establish whether a battery occurred, *see infra note* 3 and accompanying text; second, evaluate if self-defense applies to grant immunity from liability to the defendant under La. R.S. 9:2800.19, *see infra* note 10 and accompanying text; and third, assess fault to the plaintiff, if any, to allocate responsibility proportionally between the parties, *see infra* notes 8-9 and accompany text. If the defendant is found to have committed a battery and used excessive retaliation, a comparative fault analysis then tests the degree of the plaintiff's provocation but cannot bar the plaintiff's recovery. Comparative fault assesses proportional responsibility rather than absolutely bar recovery in these cases. Only the plaintiff's consent to the battery or the defendant's justified self-defense can completely bar the plaintiff from recovery, as these are complete defenses that negate the wrongfulness of the defendant's conduct. "[T]he full defenses of consent and privilege [are] intact. In this way the comparative fault principles will be confined to the job they were designed to do—taking victim fault into account." *Landry*, 02-1443, p. 11, 851 So.2d at 952 (citing Robertson, *The Louisiana Law of Comparative Fault: A Decade of Progress, supra* at 7). Thus, pursuant to *Landry*, even if the plaintiff is found to have initially provoked the incident, damages can still be recovered, though the amount may be reduced based on the degree of fault. Moreover, the plaintiff can be found to be zero percent at fault if the initial actions by the plaintiff are reasonable and not provocative under a totality of the circumstances comparative fault analysis. *See*, *e.g.*, *Dowden v. Cutright*, unpub., 13-747 (La. App. 3 Cir. 12/11/13), 2013 WL 6536287 (where the plaintiff was found not to be at fault). By analyzing these issues sequentially and logically, the legal process ensures clarity and proper adjudication by the district court.

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

In *Landry*, the Supreme Court interpreted La. C.C. art. 2323 as requiring a comparative fault assessment of both the fault of the plaintiff and the defendant where the acts of both parties are negligent or the acts of both parties are intentional. *Landry*, 02-1443, p. 18, 851 So.2d at 956. "It is only where a plaintiff is negligent in contributing to his injuries and the defendant has committed an intentional act, that assessment of the comparative fault of the plaintiff is prohibited under [La.] C.C. art. 2323, paragraph (C)."[7] *Inzinna v. Walcott*, 02-0582, p. 9 (La. App. 1 Cir. 11/21/03), 868 So.2d 721, 727 (citing *Landry*, 02-1443,

---

[7] For example, in *Le v. Nitetown, Inc.*, 10-1239, p. 1 (La. App. 3 Cir. 7/20/11), 72 So.3d 374, 375, the Third Circuit found that the trial court erred as a matter of law in reducing the plaintiffs' damages under comparative fault where the defendant was found liable for intentional tort and the plaintiffs' damage awards was based on the comparative negligence of one of the plaintiffs.

p. 18, 851 So.2d at 956). The district court explicitly found Elton's testimony credible that Plaintiff pushed Elton and that Elton struck Plaintiff in the face. The court further found it "undisputed that Elton Nobre committed a battery, or intentional tort," against Plaintiff and undertook a comparative fault analysis. We infer that the district court found the acts of both Plaintiff and Elton were intentional. The lower court made no finding that Elton's conduct was justified under circumstances that would entitle him to tort immunity. Any error in the district court's use of "self-defense" language in its reasons is harmless.

We next turn to whether the district court's allocations of fault were manifestly erroneous or clearly wrong. The Supreme Court recently reiterated the pertinent standard as follows:

> In determining the percentages of fault, the trier of fact must consider the nature of each party's conduct and the extent of the causal relationship between that conduct and the damages claimed. *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La. 1985). Consideration of several factors ("Watson factors") aids in the determination of a proper degree of fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Watson*, 469 So.2d at 974. These same factors guide an appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. *Duncan* [*v. Kansas City S. Ry. Co.*], 00-0066 at 11 [(La. 10/30/00)], 773 So.2d [670] at 681.

*Tisdale v. Hedrick*, 22-01072, p. 8 (La. 3/17/23), 359 So.3d 484, 490.

13

In addition to the *Watson* factors and expanding on them for intentional tort battery cases,[8] we find that the following considerations are relevant in assessing the reasonableness of the conduct of the parties: (1) the nature of the initial actions that provoked the actor; (2) the reasonableness of force used by the actor relative to the amount of force used by the other party; and (3) the extent of injuries received by each party.[9]

A totality of the circumstances analysis is necessary to apply the *Watson* factors and the other considerations. In similar cases, other circuit courts have focused on the circumstances of the plaintiff's initial actions and the retaliatory response by the defendant in making an allocation of fault determination taking into account the nature of the injuries sustained by the parties.

For instance, in *Dowden v. Cutright*, unpub., 13-747 (La. App. 3 Cir. 12/11/13), 2013 WL 6536287, at *3, the court found that the "slight push" by the plaintiff, Dowden, of the defendant, Cutright, did not justify Cutright's use of responsive force and continuous beating of Dowden. The court allocated 100% fault to Cutright after finding that Cutright used unreasonable and excessive force and Dowden's initial actions were reasonable under the circumstances. *Id*. The court found that Dowden, "lightly touched" Cutright to push her away as she was

---

[8] *Watson* prefaced its recitation of factors, stating, "[i]n assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: . . ." 469 So.2d at 974. We find that by use of the term "including" before listing the appropriate factors to be considered, the *Watson* court intended the list of factors to be illustrative, not exhaustive. *See id.*

[9] We note that in *Landry*, 02-1443, p. 13, 851 So.2d at 953, the Supreme Court held that "the aggressor doctrine no longer has a place in Louisiana tort law." Nonetheless, if Plaintiff is deemed to have provoked Defendant, the court can take this factor into consideration in determining percentages of fault under La. C.C. art. 2323. *Id.*

within inches of Dowden's face. *Id.*, 13-747, 2013 WL 6536287, at \*2. There was heated verbal communication between Cutright and Dowden with no threat of physical force to Cutright. *Id.*, 13-747, 2013 WL 6536287, at \*3.

However, in *Williams v. Moore*, 45,299, p. 1 (La. App. 2 Cir. 5/19/10), 36 So.3d 1214, 1215-16, the trial court found the plaintiff's initial actions were provocative and, after a bench trial, the trial court found that both parties were equally at fault and reduced the total damage amount by half. The judgment was affirmed on appeal. *Id.*, 45,299, p. 6, 36 So.3d at 1218. In *Williams*, while the plaintiff was in a bar with his girlfriend, the plaintiff alleged that the defendant approached the plaintiff's girlfriend and touched her inappropriately. *Id.*, 45,299, p. 1, 36 So.3d at 1215. Seeing this, the plaintiff told the defendant that the woman was his girlfriend and advised him to leave her alone. After a verbal exchange, the couple walked toward the exit. *Id.* The plaintiff testified that, as he walked out of the bar, he "push[ed] or bump[ed]" the defendant, while the defendant and his best friend claimed that the plaintiff shoved the defendant and then hit him in the eye; the trial court did not determine who swung first. *Id.*, 45,299, pp. 4-5, 36 So.3d at 1217. The defendant responded by punching the plaintiff in the face, causing him to fall to the ground. *Id.*, 45,299, p. 4, 36 So.3d at 1217. The plaintiff was treated on the scene by emergency medical personnel and was ultimately taken to the emergency room. *Id.*, 45,299, p. 1, 36 So.3d at 1215. As a result of the attack, the

plaintiff sustained multiple facial fractures including a broken nose and an orbital "blow-out." *Id.*[10]

In the case *sub judice*, Plaintiff insists that no fault can be allocated to him, because the following facts were undisputed at trial:

> (1) [Mr.] Nobre struck [Plaintiff's] vehicle and stopped him in the road; (2) [Plaintiff] eventually exited the vehicle when [Mr.] Nobre refused to back away from the vehicle; (3) a non-party family member reported this to Elton Nobre, who is [Mr. Nobre's] son; (4) Elton Nobre intervened out of concern for his father; ([5]) Elton Nobre overreacted to the circumstances and struck [Plaintiff] in the face; ([6]) Elton Nobre and [Plaintiff] scuffled on the ground after Elton struck him; ([7]) [Mr.] Nobre then intervened to assist Elton Nobre; and ([8]) [Plaintiff] suffered injuries from the initial strike and subsequent altercation.

LIGA counters that Plaintiff provided conflicting testimony, which the district court did not find reliable or entirely credible. The district court particularly noted Plaintiff's statements, recorded in the police report, that Elton came outside and "sucker punched" Plaintiff in the face as he was turning around to walk to his car; Plaintiff's statements in his medical records that he remembered falling down, "coming to," being "semi-conscious," and two "youngsters" piling on to him and neighbors chasing the youngsters down; and Plaintiff's trial testimony that he did not argue with or raise his voice to Mr. Nobre. While Plaintiff denied being an

---

[10] *Compare Landry*, where the Court did not apply comparative fault because it found that the defendant, Bellanger, was acting in self-defense when he punched the plaintiff, Landry, and was immune from liability under La. R.S. 9:2800.19. *Id.*, 02-1443, pp. 16-17, 851 So.2d at 955. Landry had been verbally provoking Bellanger with the threat of physical violence inside a bar and physically and aggressively pushed Bellanger with his chest once outside of the bar and continued to threaten physical violence. *Id.*, 02-1443, pp. 17-18, 851 So.2d at 955-56. The Court found Bellanger's punch was justified under the circumstances and did not involve excessive force, explaining that Landry outweighed Bellanger by 90 pounds and Landry was intoxicated, causing his actions to be unpredictable in a barroom setting. *Id.*, 02-1443, p. 18, 851 So.2d at 956.

aggressor in the incident, Elton testified that both Plaintiff and Mr. Nobre shouted at each other, and Plaintiff pushed Mr. Nobre and then pushed Elton. The district court found Elton credible because his account of the incident was consistent. Nevertheless, the district court found Elton substantially more at fault, and a reasonable factual basis for this finding exists in the record on appeal.

A review of the record in the case *sub judice*, in conjunction with the *Watson* factors, other considerations, and persuasive case law, supports the district court's conclusion that Elton bears significantly more fault than Plaintiff with respect to the nature of the conduct and the relationship to the damage. The district court credited Elton's testimony that Plaintiff initially pushed Elton. Elton admitted that he responded by escalating the violence, striking Plaintiff in the face. The force used by Elton was unreasonable. The amount of force used by Elton was disproportionate to the amount of force used by Plaintiff. Plaintiff suffered physical injuries for which he sought treatment at an urgent care clinic.

The significant risk introduced by Elton's conduct and the absence of any immediate threat justifying such an extreme response clearly align with the principles underpinning the *Watson* factors and other considerations. The initial physical contact by Plaintiff, a push, may have been a minor, somewhat inadvertent escalation of an ongoing altercation which is slightly distinguishable from the bar room altercation in the *Williams* case and the reasonable nature of the initial actions in *Dowden*. Elton's response — a forceful punch — was a deliberate and dangerous escalation.

Application of the laws of comparative fault in battery cases must work to encourage individuals to respond to heated engagements and provocations proportionately. Such an application supports the prevention of escalation of violence and ensures that self-defense claims are justified and not used as a cover for retaliatory excessive violence. While individuals may react to protect their persons and property, responses should not exceed what is necessary to avert the threat. The initial shove by Plaintiff, while slightly provocative, did not justify the excessive force used in response by Elton. Allocating a distribution of liability reflects an attempt to quantify the culpability of each party based on their actions' severity and consequences. The *Watson* factors and above public policy concerns do not alleviate Plaintiff of all liability for his actions; instead, they dictate that Elton must be assigned greater liability due to his more aggressive response to the non-threatening situation.

Accordingly, we reject Plaintiff's argument that the district court erred in allocating comparative fault to him and find that the district court's findings of fact are not clearly wrong or manifestly erroneous. We find this assignment lacks merit.

**General Damages**

"General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." *Jones v. Mkt. Basket Stores, Inc.*, 22-00841, p. 15 (La. 3/17/23), 359 So.3d 452,

464. "The factors to be considered in assessing quantum of general damages for pain and suffering are severity and duration." *Preston v. Certain Underwriters at Lloyd's London*, 23-0277, p. 8 (La. App. 4 Cir. 1/22/24), 381 So.3d 827, 834.

Appellate courts review a general damage award using a two-step analysis. *Pete v. Boland Marine & Mfg. Co., LLC*, 23-00170, p. 10 (La. 10/20/23), 379 So.3d 636, 644, *reh'g denied*, 23-00170 (La. 12/7/23), 374 So.3d 135. The initial inquiry is whether the trier of fact abused its discretion in assessing the amount of damages. *Id.* The Louisiana Supreme Court recently modified this analysis in that, "to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review." *Id.* If the appellate court finds an abuse of discretion, the court must then consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Id.* (quoting *Jones*, 22-00841, p. 16, 359 So.3d at 464).

"The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-0309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. *Id.*, 08-0309, p. 5, 979 So.2d at 459. "This vast discretion is such that an appellate court

should rarely disturb an award of general damages." *Howard v. Union Carbide Corp.*, 09-2750, p. 5 (La. 10/19/10), 50 So.3d 1251, 1255-56.

Plaintiff complains on appeal that the district court's general damage award of $2,500 is abusively low. In keeping with the Supreme Court's recent pronouncement in *Pete*, 23-00170, p. 10, 379 So.3d at 644, we "consider the particular facts and circumstances of a case, in conjunction with a review of prior awards," to determine whether the trier of fact abused its discretion in its general damage award.

The record evidence reflects that Plaintiff sought medical attention from health care providers on four occasions in the nine-month period after the altercation. On April 28, 2014, three days after the incident, Plaintiff presented at an urgent care clinic, complaining of facial pain, puncture wound to his left lower lip, and "questionable non displaced nasal bone fracture." He reportedly saw a dentist, but no dental records were introduced into evidence. He informed the clinic staff that he had fallen in the altercation, but did not hit his head.

More than five months later, on October 20, 2014, Plaintiff was seen by Dr. R. Vaclav Hamsa, an orthopedist. Dr. Hamsa previously treated Plaintiff, most recently in 2012, for cervical and lumbar symptoms. Dr. Hamsa also indicated that Plaintiff underwent left shoulder surgery in 2001. Plaintiff informed Dr. Hamsa that he developed headaches, confusion, low back pain, neck pain, and left shoulder pain and weakness. Dr. Hamsa ordered a cervical MRI, which was performed on November 17, 2014. The reading radiologist, Dr. William

Armington, opined that when compared with prior 2011 imaging studies, the MRI did not reveal any change since the prior examination. On January 12, 2015, Plaintiff returned to Dr. Hamsa for evaluation. Dr. Hamsa disagreed with Dr. Armington's radiology review, as Dr. Hamsa believed that spondylosis at several cervical levels had increased since the 2011 imaging study. Dr. Hamsa opined that Plaintiff "was doing well enough before the injury" and that the incident "set off post-traumatic spondylosis." No evidence was introduced, however, that Plaintiff underwent any further medical treatment. Additionally, no records were introduced showing that Plaintiff filled or took any prescribed medication, underwent physical therapy, or received any injections. No physician testified at trial on Plaintiff's behalf.

This Court recently examined cases in which the appellate courts found no abuse of discretion in awarding a plaintiff $2,500 in general damages per month of treatment for soft tissue injuries. *See Preston v. Certain Underwriters at Lloyd's London*, 23-0277, p. 9 (La. App. 4 Cir. 1/22/24), 381 So.3d 827, 834 (citing *Joseph v. Houston*, 04-350 (La. App. 5 Cir. 10/12/04), 886 So.2d 1133 [finding that the district court did not abuse its discretion in awarding plaintiff $2,500 in general damages per month of chiropractic treatment]; *Prejeant v. Gray Ins. Co.*, 15-87 (La. App. 5 Cir. 9/23/15), 176 So.3d 704 [affirming the district court's award of $2,000 in general damages per month for soft tissue injuries]). *See also Sanchez v. Dubuc*, 12-526, p. 10 (La. App. 5 Cir. 2/21/13), 110 So.3d 1140, 1146 (stating "there is support in the jurisprudence for an award of $2,000 to $2,500 per month

for soft tissue injuries" and citing *Ennis v. Sears, Roebuck and Co.*, 08-235 (La. App. 5 Cir. 2/25/09), 9 So.3d 899 [affirming general damage award of $24,000 for a twelve-month soft tissue injury within lower court's discretion]; *Bittner v. Scott*, 07-718 (La. App. 5 Cir. 2/6/08), 980 So.2d 5 [affirming a general damage award of $35,000 for a fifteen-month soft tissue injury]; and *Williams v. Roberts*, 05-852 (La. App. 5 Cir. 4/11/06), 930 So.2d 121 [affirming a general damage award of $7,500 for a three-month soft tissue injury]).

Another panel of this Court recently upheld a total general damage award of $40,000 where a plaintiff involved in an altercation suffered a scalp laceration that required staples, headaches associated with a scalp injury and minor soft tissue injuries to his shoulder, back, hip and wrist that resolved in one or two months. *Stennis v. Lowe's Home Centers, LLC*, 23-0482, pp. 18-19 (La. App. 4 Cir. 4/2/24), --- So.3d ----, ----, 2024 WL 1403408, at *9-10. The general damage award in *Stennis* was greater than the prior awards in other cases considered by the Court. *See Higgins v. American Nat'l General Ins. Co.*, 01-193 (La. App. 5 Cir. 9/25/01), 798 So.2d 1078 (affirming general damages award of $25,000 for head and scalp injuries painful to touch for two months and a bruised abdomen that resolved quickly); *Le v. Nitetown, Inc.*, 10-1239 (La. App. 3 Cir. 7/20/11), 72 So.3d 374 (increasing general damages for a scalp laceration with sutures and surrounding hematoma to $5,000.00); *Prejean v. State Farm Mut. Auto. Ins. Co.*, 15-499 (La. App. 3 Cir. 1/6/16), 183 So.3d 823 (finding no abuse of discretion in general damages award of $4,000.00 for headaches, migraines and lower

22

backaches); *McCullin v. U.S. Agencies Cas. Ins. Co.*, 34,661 (La. App. 2 Cir. 5/9/01), 786 So.2d 269 (finding no abuse of discretion in general damages award of $7,000 for soft tissue injuries in shoulder, back and neck, from which plaintiff fully recovered in two months except for occasional shoulder pain); *Dowden*, 13-747, 2013 WL 6536287 (finding no abuse of discretion for a general damages award of $20,000 where plaintiff's injuries from an altercation resulted in a broken rib, numerous contusions and abrasions, and a broken tooth).

Plaintiff asserts that he should be awarded general damages totaling $78,500. He argues the award should be comprised of (1) $30,000 for lip and nasal injuries, *see Moore v. Stewart*, 47,206 (La. App. 2 Cir. 6/27/12), 94 So.3d 1018, 1024 (deviated septum, septal hematoma, facial bruising, sinus problems, and some loss of sense of smell); (2) $28,500 for neck, back, and shoulder injuries, *see Johnson v. St. Romain*, 11-266 (La. App. 3 Cir. 10/5/11), 74 So.3d 836 ($22,500 for shoulder pain radiating into neck with eight weeks of conservative treatment and inability to participate in prior activities of horseback riding and rodeo with ongoing pain), and *Saucier v. Players Lake Charles, LLC*, 99-1196 (La. App. 3 Cir. 12/22/99), 751 So.2d 312 ($150,000 for rotator cuff tear and biceps tendon rupture, sustained in false arrest when being handcuffed and carried down stairs, requiring ongoing periodic injections for pain relief); and (3) $20,000 for headaches, tinnitus, and a minor concussion, *see Desselle v. Jefferson Hosp. Dist. No. 2*, 04-455 (La. App. 5 Cir. 10/12/04), 887 So.2d 524 ($18,000 where no apparent injuries after patient fell from stretcher, complained of headaches,

numerous preexisting physical complaints and mental confusion, and patient died of causes unrelated to fall).

We cannot say, on the evidence of record, that the cases on which Plaintiff relies are similar to the facts before us or to Plaintiff's injuries. Considering the particular circumstances and credibility determinations made at trial, the district court could have reasonably concluded that any pain and suffering Plaintiff sustained, which was related to this incident, was akin to a one-month soft tissue injury, for which courts regularly have upheld $2,500 general damage awards. The lower court in its fact-finding role could have determined on the medical evidence that Plaintiff sustained minor facial injuries, for which he sought treatment at an urgent care clinic three days after the altercation and which resolved. The court could have also discerned that Plaintiff's treatment thereafter was sparse, inconsistent, and unrelated to the events in litigation, particularly in light of prior treatment to the neck and left shoulder. Moreover, as the district court found portions of Plaintiff's testimony incredible, the court may have likewise disregarded Plaintiff's subsequent pain complaints. In this context, we see no abuse of discretion in the district court's general damage award of $2,500. We find this assignment of error lacks merit.

**Policy Exclusions**

The interpretation of an insurance policy is normally a question of law, which the appellate court reviews *de novo* to determine whether the lower court's interpretive decision is legally correct. *Armenia Coffee Corp. v. Am. Nat. Fire Ins.*

*Co.*, 06-0409, p. 6 (La. App. 4 Cir. 11/21/06), 946 So.2d 249, 253. Whether an insurance policy exclusion applies to exclude coverage in a particular case may present a mixed question of law and fact, which is subject to the manifest error standard of review. *Power v. State Farm Fire & Cas. Co.*, 15-796, p. 11 (La. App. 5 Cir. 5/26/16), 193 So.3d 471, 477 (citing *Doerr v. Mobil Oil Corp.*, 00-947, p. 26 (La. 12/19/00), 774 So.2d 119, 135 n. 17, *opinion corrected on reh'g*, 00-947 (La. 3/16/01), 782 So.2d 573; *Ogea v. Merritt*, 13-1085, p. 7 (La. 12/10/13), 130 So.3d 888, 895 n. 6).

This Court recently summarized the legal principles courts must apply in analyzing insurance policies, as follows:

- An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code. [Footnote omitted]

- The parties' intent as reflected by the words in the policy determine the extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. LSA-C.C. Art. 2047.

- An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion.

- Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume.

- [I]f the policy wording at issue is clear and unambiguously expresses the parties' intent, the

insurance contract must be enforced as written. LSA-C.C. Art. 2046 (providing that when the words of a contract are clear, no further interpretation may be made to determine the parties' intent).

- When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. The determination of whether a contract is clear or ambiguous is a question of law.

*Moon v. Safeway Ins. Co. of Louisiana*, 22-0455, pp. 5-6 (La. App. 4 Cir. 12/6/22), 353 So.3d 352, 356 (citing *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94), 630 So.2d 759, 763-64).

In Plaintiff's final assignment of error, he argues that the district court erred in dismissing the Nobres' third party demand against LIGA. Plaintiff argues that the district court erroneously found no coverage under the SFIC policy for Plaintiff's claims. The parties stipulated at trial that LIGA is the statutory obligor for SFIC to the extent there is a covered claim or cause of loss.[11] In its judgment, the district court determined that the "criminal act" exclusion applied, which barred coverage for the damages alleged in this litigation.[12]

The SFIC policy's "criminal act" exclusion provides:

> E. ... Coverage E and F do not apply to the following:
> …
> 9. Criminal Act "Bodily injury" or "property damage" arising out of or during any criminal act or violation of any law or ordinance.

---

[11] *See* La. R.S. 22:2058(A)(1)(a) and (A)(2). Generally, LIGA is "obliged to pay covered claims … existing prior to the determination of the insurer's insolvency . . . ." La. R.S. 22:2058(A)(1)(a). LIGA has "all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent . . . ." La. R.S. 22:2058(A)(2).

[12] Plaintiff argues that the policy's "expected or intended injury" exclusion also does not apply. The district court made no finding as to the "expected or intended injury" exclusion, and as we agree with the district court that the "criminal act" exclusion bars coverage, we pretermit consideration of the other disputed exclusion.

The policy defines "arising out of" or "arises out of" to mean:

> any and all claims based on the identified conduct or occurrence, no matter how a legal claim or cause of action is defined, described, presented or alleged, and no matter whom it is alleged against, is considered to be part of any exclusion, coverage or definition using those terms, regardless of whether the insured committed the act itself or is alleged to be negligent in any way.

Under the policy, "criminal act" is defined as:

> any action or instance of negligence that is deemed injurious to public welfare or morals and is legally prohibited as a written or positive rule or collection of rules under the authority of the state or nation.

While Plaintiff's argument is difficult to interpret, he appears to claim that the exclusion does not apply because Elton's intent was to protect Mr. Nobre. In this argument, he also seems to contend that the exclusion is ambiguous and against public policy. We must reject these arguments.

First, we find the language in the "criminal act" exclusion clear and unambiguous. The exclusion explicitly bars coverage for bodily injury during a criminal act or violation of any law. The policy definitions plainly state that the exclusion applies regardless of whether the insured committed the act itself. It is undisputed that, for the same incident at issue in this lawsuit, Elton was convicted in criminal court of simple battery, a violation of La. R.S. 14:35.

Plaintiff cites to *Young v. Brown*, 27,018 (La. App. 2 Cir. 6/21/95), 658 So.2d 750, to argue that another criminal act exclusion "did not apply." We find Plaintiff's reliance on *Young* is misplaced. The *Young* appellate court reversed summary judgment because it found an Allstate policy exclusion for "intended or

27

criminal acts" was ambiguous and construed same as to not preclude coverage. *Id.*, 27,018, p. 7, 658 So.2d at 754. The Allstate exclusion read:

> We do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which is in fact intended by an insured person.

*Id.*, 27,018, p. 3, 658 So.2d at 752. The defendant-insured, who had consumed several beers and was armed with a gun, stumbled as he approached a group of people and fell into the plaintiff, whereupon the gun fired and the plaintiff was shot in the stomach. *Id.*, 27,018, p. 2, 658 So.2d at 751-52. The defendant-insured denied any intent to shoot or harm the plaintiff and pled guilty to negligent injuring. *Id.*, 27,018, p. 6, 658 So.2d at 753. Under Louisiana law, negligent injuring does not require proof of either specific or general criminal intent.[13] The appellate court found the term "criminal acts" ambiguous because it was susceptible of more than one meaning. *Id.*, 27,018, p. 8, 658 So.2d at 754. Under the court's rationale, a "reasonable liability insurance buyer could construe the instant exclusion to deny coverage only for intentional criminal acts, thereby allowing coverage for damages arising out of non-intentional, criminal negligence." *Id.*

Notably and unlike *Young*, no defendant herein was accused of "non-intentional criminal negligence"; Elton was found guilty of simple battery: the

---

[13] "Negligent injuring is … [t]he inflicting of any injury upon the person of another by criminal negligence." La. R.S. 14:39(A)(1). "Criminal negligence exists when, *although neither specific nor general criminal intent is present*, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12 (emphasis added).

*intentional* use of force or violence upon the victim without the victim's consent. *See* La. R.S. 14:35(A); La. R.S. 14:33; *State v. Hernandez*, 96-0115, p. 3 (La. App. 4 Cir. 12/18/96), 686 So.2d 92, 95. Plaintiff fails to identify any ambiguous policy language, and we do not discern any. Where the policy language is "clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written" and "no further interpretation may be made to determine the parties' intent." *Louisiana Ins. Guar. Ass'n*, 93-0911, 630 So.2d at 764 (citing La. C.C. art. 2046).

Additionally, we find no manifest error in the district court's findings regarding Elton's motivations in protecting his father. While Plaintiff argues that Elton overreacted and mistook the extent of any danger the altercation posed to Mr. Nobre, we cannot say – on the facts of record – that the district court's conclusion that Elton intended to strike Plaintiff in the face was clearly wrong. We see no manifest error in the district court's finding that the "criminal act" exclusion precludes coverage for Plaintiff's claims.

Moreover, this Court recently reiterated that criminal acts exclusions do not violate public policy. *See Moon*, 22-0455, pp. 8-9, 353 So.3d at 358-59 (collecting cases and quoting *Young*, 27,018, p. 4, 658 So.2d at 753)("The purpose of the exclusion is a recognition of a long-standing public policy against insuring illegal activities and thus, promoting their commission."). On the contrary, as this Court has often recognized, "it is against public policy in Louisiana to permit an insured to be indemnified for the insured's own intentional criminal acts. . . ." *McNamara*

29

*v. Augustino Bros., Inc.*, 08-1522, p. 7 (La. App. 4 Cir. 5/13/09), 13 So.3d 736, 741. In summary, we find no merit in this assignment.

## CONCLUSION

Accordingly, for the reasons set forth in this opinion, we affirm the judgment of the district court.

**AFFIRMED**